25-3141-pr
*Cunha v. Freden*

JOSÉ A. CABRANES, *Circuit Judge*, concurring in the judgment and opinion of the Court:

I join Judge Bianco's thoughtful and learned opinion wholeheartedly and without reservation. I also write separately to applaud that opinion and to emphasize key points.

\* \* \*

Twenty-one years ago, a Brazilian man crossed the southern border to enter the United States. He now has two children who are U.S. citizens and a small construction company. He has no criminal record. In September, near a Home Depot in Norwood, Massachusetts, immigration agents arrested him, launched removal proceedings against him, and detained him without bond, though he posed no flight risk or danger.[1]

The man applied for habeas corpus. Petitioner, as he became, argued that he was properly detained under 8 U.S.C. § 1226(a), which allows for release on bond, not § 1225(b)(2)(A), which mandates detention. The District Court agreed and ordered a bond hearing that led to his release.[2]

On appeal, Respondent argues that Congress clearly required the Executive to detain millions of people like Petitioner—parents of American children, owners of American businesses, members of American communities—but that some thirty years passed before

---

[1] *Post* at 5.
[2] *Id.* at 8.

1

anyone noticed. In the meantime, fifteen Congresses stood silently by as five presidents ignored the plain text of the statute. Immigration officials also failed to grasp that Congress had told them to round up people by the millions. The capacity to carry out the largest detention in American history went unbuilt.[3]

Today this Court, in the majority's exhaustive opinion, refuses to credit Respondent's tale. This is good news.

\* \* \*

Respondent's basic argument is that § 1225(b)(2)(A) governs Petitioner's detention. This provision reads, "in the case of an alien who is an applicant for admission,[4] if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding." It is undisputed that Petitioner is "an applicant for admission." But the parties contest whether he is also "seeking admission." If he is, they agree that mandatory detention kicks in.

At first glance, Respondent's argument that Petitioner is "seeking admission" has some force. Petitioner is concededly an "applicant for admission," and an "applicant" for something—

---

[3] *Id.* at 48–49.

[4] "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." § 1225(a)(1).

whether a job, grant, or admission—is typically "seeking" it. Language elsewhere in § 1225 might be taken to back up this view, suggesting some relationship between applicants for admission and those seeking admission. *See* § 1225(a)(3) ("All aliens . . . who are applicants for admission *or otherwise seeking admission* . . . shall be inspected by immigration officers.") (emphasis added).

But Petitioner's reply—that he falls outside § 1225(b)(2)(A)'s reach because he is not "seeking admission"—counteracts Respondent's argument and then some. As Judge Bianco's opinion for the panel makes abundantly clear, this reading must prevail for three core reasons.

First, the Supreme Court has said that it is right. "U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)."[5] Because Petitioner was "already in the country" and not "seeking admission into" it, his detention is governed by § 1226.

Second, even if the Supreme Court's observations are dicta, as Respondent claims,[6] they are right. To see why, properly define

---

[5] *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018).

[6] Resp't's Br. at 46; *see also Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 505 (5th Cir. 2026) (crediting this argument).

"seeking admission" within the meaning of the statute and ask if that is what Petitioner is doing.

Congress defined "admission" as "the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer."[7] And, in an immigration case long ago, the Supreme Court confirmed the obvious: "The word 'entry' by its own force implies a coming from outside."[8] Now put those two definitions together. To be "seeking admission," Petitioner must be seeking to come inside from outside. Established judicial usage of the term "seeking admission" confirms this understanding. The Supreme Court has repeatedly used that term to refer to aliens arriving from abroad—including, instructively, in the run-up to § 1225(b)(2)(A)'s enactment.[9] In short, someone who is "seeking admission" is trying to go from the exterior to the interior.

Against this background, no one can seriously contend that Petitioner is "seeking admission" twenty-one years after he entered

---

[7] § 1101(a)(13)(A) (emphasis added).

[8] *United States ex rel. Claussen v. Day*, 279 U. S. 398, 401 (1929); *see also post* at 40 (explaining that the definition of "entry" has not changed).

[9] *See, e.g.*, *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 574, 583 (2017) ("[F]oreign nationals seeking admission have no constitutional right to entry."); *Landon v. Plasencia*, 459 U.S. 21, 30–33 (1982) ("The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission."); *Reid v. INS*, 420 U.S. 619, 621 (1975) ("Section 212 of the Act as amended, 8 U.S.C. § 1182, specifies various grounds for exclusion of aliens seeking admission to this country. Section 241 of the Act, 8 U.S.C. § 1251, specifies grounds for deportation of aliens already in this country.").

the country. The words, properly defined, are clear. That ought to be the end of the matter. Yet Respondent's counsel urges us to subordinate these settled definitions to his sense of "everyday meaning."[10] Because statutory definitions and established judicial constructions override everyday meaning,[11] the Court rightly passes on that offer.

And even if Petitioner were somehow seeking "entry," he surely is not seeking "entry . . . after *inspection*." Long-settled case law says that "inspection" ordinarily takes place at a port of entry,[12] not outside a Home Depot in Massachusetts.

Third, Respondent's argument that all "applicants for admission" are necessarily "seeking admission" turns that latter phrase into surplusage. If every "applicant for admission" were "seeking admission," as Respondent claims, Congress would not

---

[10] Resp't's Br. at 26–27.

[11] *See Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning.") (cleaned up); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 243 (2011).

[12] *See Guamanrrigra v. Holder*, 670 F.3d 404, 406 (2d Cir. 2012) ("The term of art 'without inspection' . . . means entering the United States borders without being admitted or paroled by United States immigration officials *at a port of entry*.") (emphasis added); *Reid v. INS*, 492 F.2d 251, 255 (2d Cir. 1974) ("Next he must submit himself at the point of entry to an INS official for 'inspection' as an alien."), *aff'd*, 420 U.S. 619 (1975); *Posos-Sanchez v. Garland*, 3 F.4th 1176, 1183 (9th Cir. 2021) (holding that admission inspection must take place "at a port of entry"); *Ex parte Saadi*, 23 F.2d 334, 336 (S.D. Cal. 1927) ("'Inspection,' to my mind, as used in the Immigration Act, means that the immigration officers are given the opportunity to check the right of the alien to enter the United States when he presents himself as an alien."), *aff'd*, 26 F.2d 458 (9th Cir. 1928).

need to have written that mandatory detention applies only to those applicants for admission who are seeking admission. As always, we are loath to find any of Congress's words hollow.

* * *

Zoom out to see the broader statutory context, and Petitioner's lead lengthens. That is because "§ 1225(b) applies primarily to aliens seeking entry into the United States,"[13] the Supreme Court has said, whereas "§ 1226 applies to aliens already present in the United States."[14] These observations suggest that § 1225(b)(2)(A)'s detention mandate does not cover those inland like Petitioner.

Once again, the statutory text confirms the Supreme Court's words. Section 1225(b)(2)'s title, "[i]nspection of other aliens," refers to a process that, as just noted, takes place at the border. Move along to § 1226, and its focus on the interior is likewise clear. It provides for the detention of certain aliens who violate *state* law,[15] presumes that *local* authorities far from the border may investigate and detain the aliens in question,[16] and gives state attorneys general standing to sue when the release of an alien "harms [a] *State* or its residents."[17]

The history of the immigration laws is also in Petitioner's corner. When Congress enacted § 1225(b)(2) in 1996, it said that the

---

[13] *Jennings*, 583 U.S. at 297.

[14] *Id.* at 303.

[15] § 1226(c)(1)(B) (citing § 1227(a)(2)(B)).

[16] § 1226(c)(3), (d)(1)(A).

[17] § 1226(f) (emphasis added).

provision would concern arriving aliens, not those inland like Petitioner. The Conference Report—"the most persuasive evidence of congressional intent" other than the text itself[18]—was not mealy-mouthed about this: it says § 1225(b) covers "aliens *arriving* in the United States."[19] And for the first twenty-nine years, nobody said otherwise. The Clinton, Bush, Obama, Trump I, and Biden administrations all agreed with Petitioner that § 1226, not § 1225, governs interior detention.[20] We give "substantial weight" to that "early (and consistent) view of [the] statute."[21] If Respondent is right that in 1996 Congress ordered the largest mass detention in American history, the world would have likely noticed sooner. Small wonder that some 90 percent of the hundreds of district judges across the land who have heard Respondent's argument have rejected it.[22]

One last fact is telling. In 1996 Congress mandated the detention of certain aliens, mostly criminals, under § 1226(c)(1). At the time, Congress knew that immigration-detention facilities had around 8,500 beds, enough to detain some 100,000 aliens yearly.[23] That might have been inadequate in light of the new detention

---

[18] *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000).

[19] H.R. Rep. No. 104–828, at 209 (1996) (Conf. Rep.) (emphasis added); *accord* H.R. Rep. No. 104–469, pt. 1, at 229 (1996).

[20] *Post* at 52–53.

[21] *Safdieh v. Comm'r of Internal Revenue*, 169 F.4th 102, 108 & n.31 (2d Cir. 2026); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386, 394 (2024).

[22] Kyle Cheney & Josh Gerstein, *Another Appeals Court Backs Trump Administration's Mass Detention Policy,* Politico (Mar. 25, 2026, at 12:25 PM), https://www.politico.com/news/2026/03/25/mandatory-detention-ruling-8th-circuit-00844386.

[23] H.R. Rep. No. 104-469, pt. 1, at 123 (1996).

mandates.  So Congress gave the Attorney General two years during which certain aliens could be released while five hundred beds were added.[24]  Notably, Congress allowed no such grace period for the mandatory detention of the *two million* aliens that Respondent says then came within § 1225(b)(2)'s sweep.[25]  That discrepancy is inexplicable.  And, as a final piece in the textual, structural, and historical puzzle, it is yet another reason why the judgment of the District Court has been quite rightly affirmed.

---

[24] 8 U.S.C. § 1368(a);  Pub. L. No. 104–208, § 303(b)(2), 110 Stat. 3009, 586–87 (1996).
[25] *Post* at 48–49.