25-3141
*Barbosa da Cunha v. Freden*

MENASHI, *Circuit Judge*, joined as to Parts I and II-E by PARK, *Circuit Judge*, dissenting from the denial of rehearing *en banc*:

Justice Scalia once identified the "true rule" of statutory interpretation to follow when a court perceives dissonance between a statutory definition and the ordinary meaning of a term: "When a statute includes an explicit definition, we must follow that definition, *even if it varies from that term's ordinary meaning*." *Bond v. United States*, 572 U.S. 844, 871 (2014) (Scalia, J., concurring in the judgment) (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)). In *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026), a panel of this court violated that rule, and today the *en banc* court declines to correct the error. I dissent from the denial of rehearing *en banc*.

In *Barbosa da Cunha*, the panel held that 8 U.S.C. § 1225(b)(2)(A) "does not apply" to aliens "who are present in the United States after entering the country without inspection and admission, and who were not apprehended while entering the country or shortly thereafter." 175 F.4th at 69. The panel claimed that its conclusion follows from the "plain text" of the statute. *Id.*

That is wrong. The statute provides that "in the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Congress has directed that, for purposes of the Immigration and Nationality Act, "[a]n alien present in the United States who has not been admitted" shall be "deemed" to be "an applicant for admission." *Id.* § 1225(a)(1).

Thus, the statute deems an unadmitted and illegally present alien to be an applicant for admission. It is true that unadmitted illegal aliens are not *actually* applying for admission or otherwise seeking

admission to the country because they have already entered illegally. But under the scheme that Congress enacted, those aliens are "deemed *constructive* applicants for admission by operation of [§ 1225(a)(1)]." *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 743 n.6 (BIA 2012). In a legal—albeit "artificial"—sense, those constructive applicants for admission are "seeking admission" for purposes of the INA. *Id.* (alteration omitted). I would rehear this case *en banc* to give effect to the statute that Congress adopted, including its mandate to treat unadmitted illegal aliens as applicants for admission for purposes of the INA.

The panel made an additional error—unrelated to the statutory interpretation question—by treating the requested relief as cognizable in habeas. The petitioner in this case sought a writ of habeas corpus. "Habeas is at its core a remedy for unlawful executive detention," and "[t]he typical remedy for such detention is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Barbosa da Cunha, however, did not claim he was entitled to release. He sought a court order requiring the federal government to (1) reclassify him as an alien who was not seeking admission and then (2) to offer him the bond hearing that an alien subject to discretionary detention may receive. Properly understood, he sought relief akin to a mandatory injunction or mandamus.

Allowing Barbosa da Cunha to bring such a claim in habeas "would require us to broaden the scope of habeas relief beyond recognition." *Wilkinson v. Dotson*, 544 U.S. 74, 85 (2005) (Scalia, J., concurring). And that expansion conflicts with Supreme Court precedent. When an alien sought "a writ directing the [government] to provide him a new opportunity to apply for asylum," the Supreme Court emphasized that such a writ "is not a form of relief that was available in habeas at the time of the adoption of the Constitution."

*DHS v. Thuraissigiam*, 591 U.S. 103, 117 n.13 (2020) (internal quotation marks and alterations omitted). The same conclusion applies here: The writ of habeas corpus "has never encompassed" the sort of claim that Barbosa da Cunha has made. *Id.* at 116 n.12. I would rehear this case *en banc* also to clarify that habeas is not available to an alien who seeks not release but statutory reclassification and additional administrative procedures.

This case "involves one or more questions of exceptional importance." Fed. R. App. P. 40(b)(2)(D). If the government has the correct interpretation of the statute, it would have the significant "impact of requiring the detention without bond" of unadmitted illegal aliens. *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 517 (5th Cir. 2026) (Douglas, J., dissenting). And the panel opinion "conflicts with" the decisions of other courts of appeals. Fed. R. App. P. 40(b)(2)(C). The panel expressly rejected the holdings of the Fifth and Eighth Circuits with respect to the same issue. *See Barbosa da Cunha*, 175 F.4th at 72 (citing *Buenrostro-Mendez*, 166 F.4th at 508 (majority opinion), and *Avila v. Bondi*, 170 F.4th 1128, 1138 (8th Cir. 2026)). Since the panel issued its opinion, the split has deepened.[1] Moreover, by extending the scope of habeas relief beyond the limits identified in *Thuraissigiam*, "the panel decision conflicts with a decision of the United States Supreme Court." Fed. R. App. P. 40(b)(2)(B).

---

[1] *See Lopez-Campos v. Raycraft*, 175 F.4th 713, 734-35 (6th Cir. 2026); *Hernandez Alvarez v. Warden*, 175 F.4th 1258, 1285 (11th Cir. 2026); *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1250-51 (10th Cir. 2026); *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1193 (9th Cir. 2026); *Cirrus Rojas v. Olson*, 183 F.4th 909, 931 (7th Cir. 2026); *Guerrero Orellana v. Moniz*, No. 25-2152, 2026 WL 2352042, at *11 (1st Cir. Aug. 13, 2026); *Buele Morocho v. Warden*, No. 26-1150, 2026 WL 2546223, at *3 (3d Cir. Aug. 28, 2026).

I would rehear the case *en banc* both to give effect to the statute that Congress adopted and to respect the historical limits on habeas relief that the Supreme Court has identified.

**I**

This case involves two provisions of 8 U.S.C. § 1225. First, there is the detention provision: "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). Second, there is the deeming provision: "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." *Id.* § 1225(a)(1).

The detention provision requires the detention pending a removal proceeding of an "applicant for admission" who is "seeking admission." The deeming provision requires that an unadmitted illegal alien such as Barbosa da Cunha be treated as an "applicant for admission." That is, it requires the unadmitted illegal alien to be treated as if he were an arriving alien applying for admission to the United States. The question is whether that *constructive* applicant for admission, who is not *actually* arriving and seeking entry, must be treated as "seeking admission" for purposes of the statute.

The panel concluded that a constructive applicant for admission is *not* seeking admission. First, the panel noted that "'applicant for admission' is defined by statute to mean any noncitizen who is present in the United States and has not been

admitted, or is arriving in the United States." *Barbosa da Cunha*, 175 F.4th at 74. Second, the panel noted that "'admission' is defined by statute as 'the lawful entry of the alien into the United States after inspection and authorization.'" *Id.* (quoting 8 U.S.C. § 1101(a)(13)(A)). In the absence of a statutory definition, the panel defined "entry" as "the act of entering" and "to 'enter'" as "to go or come into a material place." *Id.* (quoting *Entry* and *Enter*, Webster's Third New International Dictionary 759, 756 (1993)). Third, the panel said that "although also not defined in the statute, the term 'seek' means … to 'request' or 'ask for,'" and "[t]he term 'seeking' is in the present participle form, which expresses present action." *Id.*

Putting these steps together, the panel concluded that the detention provision "applies only to (1) noncitizens who are present and have not been admitted, and (2) are requesting (3) lawful entry into the United States after inspection and authorization." *Id.* The panel applied that conclusion to Barbosa da Cunha, stating that "although Petitioner is an applicant for admission under the statutory definition because he is present in the country and has never been admitted, it simply cannot be said that he is 'seeking admission,' as he is not requesting lawful entry into the United States." *Id.*

In other words, Barbosa da Cunha (1) is an "applicant for admission" even though he is not actually requesting admission, but (2) he is not "seeking admission" *because* he is not actually requesting admission. The panel recognized that "'[a]pplicant' ordinarily means 'one who applies for something.'" *Id.* at 75 (quoting *Applicant*, Webster's Third New International Dictionary 105 (1993)). But the panel explained that the deeming provision "gives 'applicant for admission' an 'artificial' meaning, covering 'constructive' applicants who never applied for anything." *Id.* (quoting *Lemus-Losa*, 25 I. & N. Dec. at 743 n.6). Those constructive applicants "have not and

could not apply for what the statute defines as 'admission'—'lawful entry into the United States after inspection and authorization by an immigration officer.'" *Id.* (alteration omitted) (quoting 8 U.S.C. § 1101(a)(13)(A)).

According to the panel, Barbosa da Cunha can "only be an 'applicant for admission' *because* the statute uses 'applicant' in a 'specialized' way, rather than in its ordinary meaning." *Id.* at 76 (quoting *Feliciano v. DOT*, 605 U.S. 38, 45 (2025)). While the panel acknowledged that Congress has "deemed" the phrase "'applicant for admission' to cover noncitizens who literally cannot be applying for or seeking 'admission,'" the panel said that "the statute is silent on the meaning of 'seeking' and 'applying' and does not establish a legal fiction as to those terms, leaving them with their ordinary meanings." *Id.* And "[u]sing the ordinary meaning of 'seeking admission,' no one would consider an individual who never applied to also be 'seeking admission.'" *Id.*

In the end, the panel held that even though Barbosa da Cunha is *constructively* an applicant for admission, the detention provision does not apply to him unless he is *literally* seeking admission.

**A**

The panel's logic reflects two errors.

First, the panel misunderstood what it means to seek admission under the INA. The panel asserted that seeking admission necessarily involves an attempt to enter the United States by "coming from outside." *Id.* at 74 (quoting *United States ex rel. Claussen v. Day*, 279 U.S. 398, 401 (1929)). That is incorrect because, as the Board of Immigration Appeals has long recognized, "'admission' can include an adjustment of status despite [an alien's] illegal entry." *Lopez-Campos*, 175 F.4th at 744 (Murphy, J., dissenting) (citing *In re Rosas-Ramirez*, 22 I. & N. Dec.

616, 617-23 (BIA 1999)). The BIA has rejected the contention that a statutory reference "to an alien who 'seeks admission' applies only to one who is applying for admission at the border." *In re Rodarte-Roman*, 23 I. & N. Dec. 905, 908 (BIA 2006) (quoting 8 U.S.C. § 1182(a)(9)(B)(i)(II)). "In the Immigration and Nationality Act, the term 'admission' generally refers to adjustment of status from within the United States, as well as lawful entry at the border." *Id.*; *see also Rosas-Ramirez*, 22 I. & N. Dec. at 619 (holding that "the phrase 'after admission'" in 8 U.S.C. § 1227(a)(2)(A)(iii) "includes an alien … who has been 'lawfully admitted for permanent residence' … pursuant to a grant of adjustment of status").

We have previously recognized that an alien already present in the United States may be seeking admission for purposes of the INA. We explained that "with an adjustment application, the criminal alien *in* the United States steps into the shoes of one at the border seeking admission *to* the United States." *Seepersad v. Sessions*, 892 F.3d 121, 124 (2d Cir. 2018). In other words, "an alien within the United States who applies for an adjustment of status is assimilated to the position of an alien outside the United States seeking entry as an immigrant because an alien may adjust his status only if he is admissible." *Poveda v. Attorney General*, 692 F.3d 1168, 1176 (11th Cir. 2012) (internal quotation marks omitted).

At the same time, not every alien who seeks an actual entry into the country is seeking "admission." An arriving alien at the border might concede that he is inadmissible based on one of the grounds of inadmissibility listed in 8 U.S.C. § 1182. The inadmissible alien may nevertheless apply for asylum and request humanitarian parole into the country while he litigates his asylum claim. *See* 8 U.S.C. § 1158(a); *id.* § 1182(d)(5)(A). This alien would literally be seeking lawful entry to the United States but would not be seeking "admission" under the

INA because "[n]either a grant of parole nor a grant of asylum qualifies as an 'admission.'" *Lopez-Campos*, 175 F.4th at 744 (Murphy, J., dissenting) (citing 8 U.S.C. § 1101(a)(13)(B)); *see also Matter of V-X-*, 26 I. & N. Dec. 147, 150-51 (BIA 2013); *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021).[2]

So it is wrong to say that "seeking admission" under the INA necessarily refers to a request to enter from the outside. An alien present in the United States may seek admission without requesting to enter, and an alien at the border may request to enter without seeking admission. The meaning of the word "admission" in the INA is context-specific,[3] and in context an alien is often seeking admission for purposes of the INA in a constructive rather than ordinary sense. An alien who requires a determination that he is admissible in order to receive the immigration benefit he *actually* wants—such as an adjustment of status or authorization to remain in the country—will be considered to be seeking "admission" even if he has already entered the country.

---

[2] *See Sanchez*, 593 U.S. at 415 ("On the one hand, a foreign national can be admitted but not in lawful status—think of someone who legally entered the United States on a student visa, but stayed in the country long past graduation. On the other hand, a foreign national can be in lawful status but not admitted—think of someone who entered the country unlawfully, but then received asylum."). Nevertheless, an arriving alien—like an unadmitted illegal alien—is "deemed" to be an "applicant for admission." 8 U.S.C. § 1225(a).

[3] *See Lemus-Losa v. Holder*, 576 F.3d 752, 757 (7th Cir. 2009) ("We have no reason to disagree with the Board's position that the word 'admission' means different things, depending on the particular part of the INA that is at issue."); *Rosas-Ramirez*, 22 I. & N. Dec. at 623 n.5 ("We do not here attempt to resolve the meaning of 'admission' in other contexts or under other provisions for adjustment of status.").

Second, the panel misunderstood how the deeming provision interacts with the detention provision. The panel wrongly asserted that "'applicant for admission' is *defined* by statute" and therefore receives a "technical meaning" as a "term of art." *Barbosa da Cunha*, 175 F.4th at 74-76 (emphasis added). But the INA does not provide a *definition* of "applicant for admission." That phrase does not appear in the extensive list of defined statutory terms. *See* 8 U.S.C. § 1101. The deeming provision simply says that an unadmitted illegal alien "shall be deemed" to be an applicant for admission even when he has not actually applied. *Id.* § 1225(a)(1).[4] The statute thereby directs that the requirements that apply to an *actual* applicant for admission—an arriving alien who presents himself for inspection with entry documents at a port of entry—must also be applied to an unadmitted alien who is illegally present after avoiding inspection.

Although the unadmitted illegal alien must be treated *as if* he were an "applicant for admission," the phrase "applicant for admission" itself lacks a statutory definition and therefore receives its plain meaning. The phrase refers to someone who has applied for admission.[5] The deeming provision tells us to treat an unadmitted illegal alien *as if* he has applied for admission. As a result, we must

---

[4] In other words, the deeming provision "does not 'define' 'applicant for admission'" because it says "nothing about what 'applicants for admission' *means*." *Hernandez Alvarez*, 175 F.4th at 1288-89 (Lagoa, J., dissenting). Instead, "Congress told us what unadmitted aliens, like Petitioner, are to be *treated as*." *Id.* at 1289. The INA includes numerous deeming provisions that direct how persons, time periods, and locations must be treated. None of those provisions defines a term. *See, e.g.*, 8 U.S.C. § 1182(a)(9)(B)(ii); *id*. § 1255(g); *id*. § 1229b(d)(1); *id*. § 1441; *id*. § 1182(n)(4)(A).

[5] *See Barbosa da Cunha*, 175 F.4th at 75 ("'Applicant' ordinarily means 'one who applies for something.'") (quoting *Applicant*, Webster's Third New International Dictionary 105 (1993)).

treat an unadmitted illegal alien as if he is taking the action—seeking admission—that an applicant for admission would be taking. "The principle is straightforward. When a statute deems 'A' to be 'B,' it places A in the legal posture of B as a matter of law, with the consequences that follow." *Hernandez Alvarez*, 175 F.4th at 1289 (Lagoa, J., dissenting).

In this case, the statute deems an unadmitted illegal alien to be an applicant for admission. We know that the unadmitted illegal alien has not actually applied for anything—he has instead bypassed the process of inspection and admission—but we treat him *as if* he has applied for admission. So is that alien seeking admission? Of course he is. People who apply for something are seeking it, so the constructive applicant for admission must be regarded as seeking admission. That is what an applicant for admission necessarily does. "Because we must 'regard' the [p]etitioners 'as' 'seeking admission' under the ordinary meaning of 'applicant,' we must regard them as 'seeking admission' under [the statutory] language." *Lopez-Campos*, 175 F.4th at 741 (Murphy, J., dissenting) (alterations and citation omitted). "[B]y 'deeming' certain immigrants to be 'applicants for admission' under the INA, the law commands us to treat them as if they were applying for (or seeking) admission wherever the INA uses those phrases—whether or not they '*actually*' are doing so." *Id.* (alterations and citation omitted).

The panel's error can be seen in its own analogy to a baseball game. The panel imagined the following scenario:

> If someone sneaks into Yankee Stadium at the start of the game with no ticket for admission (and no intention of ever paying) and he is later found by security in a seat in the seventh inning, no one would consider that fan to be "seeking admission" to the game.

*Barbosa da Cunha*, 175 F.4th at 76. That is correct, as far as it goes. But now imagine that the Yankees had a policy posted at the stadium gate that stated: "Anyone found inside the stadium without a ticket shall be deemed to be an applicant for admission to the game." In light of the deeming policy, the ticketless fan *would* be considered to be seeking admission to the game. And he properly would be charged the price of admission. The fan could not avoid paying for a ticket on the ground that even though he must be considered an "applicant for admission" to the game, he is not really *seeking* admission and would prefer to remain without paying. That would be an evasion of the deeming policy. The same logic applies here: Just as the fan who bypasses the ticket counter to enter the stadium is deemed to be seeking admission, the alien who bypasses immigration inspectors to enter the country is deemed to be seeking admission as well.

**B**

The panel failed to give effect to the deeming provision. That provision does not direct that unadmitted illegal aliens be treated "as 'applicants for admission' *exclusively for that phrase*" but rather that unadmitted illegal aliens be treated as applicants for admission "when interpreting the *rest of the INA* (including phrases like 'applying for admission' or 'seeking admission')." *Lopez-Campos*, 175 F.4th at 741 (Murphy, J., dissenting). According to the logic of the panel opinion, "Congress told us to treat certain immigrants as 'applicants for admission' in one paragraph (§ 1225(a)(1)) but then expected us to *not* treat those immigrants as 'applying for admission' just three paragraphs later (§ 1225(a)(4))." *Id.* at 743. That interpretation makes no sense. The deeming provision provides that an unadmitted illegal alien must be treated as an applicant for admission "for purposes of this chapter," meaning the *entire* INA. 8 U.S.C. § 1225(a)(1). Whatever requirements the INA applies to an

actual applicant for admission must also be applied to a constructive applicant for admission. Because an actual applicant for admission is seeking admission, so is a constructive applicant for admission.

The BIA clarified this aspect of the INA in 2012. In *Matter of Lemus-Losa*, the BIA considered a case involving a Mexican citizen who "entered the United States without inspection, after which he lived in the United States for approximately 2 years without lawful status." 25 I. & N. Dec. at 735. He subsequently "departed from the United States and returned to Mexico. In 2003, [he] reentered the United States, again without inspection, and … remained here in unlawful status." *Id.*

The government commenced removal proceedings. Before the immigration court, Lemus-Losa "conceded removability from the United States" because he was "present without having been admitted or paroled," but "he applied for adjustment of status." *Id.* To qualify for an adjustment, "an applicant must be 'physically present in the United States' and must demonstrate that he or she is 'admissible to the United States for permanent residence.'" *Id.* (quoting 8 U.S.C. § 1255(i)(1), (2)(A)). The immigration judge concluded that Lemus-Losa was not admissible for permanent residence "because his history of immigration violations rendered him inadmissible" pursuant to 8 U.S.C. § 1182(a)(9)(B)(i)(II). *Id.* That provision provides that an alien who "has been unlawfully present in the United States for one year or more, and who *again seeks admission* within 10 years of the date of such alien's departure or removal from the United States, is inadmissible." 8 U.S.C. § 1182(a)(9)(B)(i)(II) (emphasis added).

The question before the BIA was whether Lemus-Losa was "again seek[ing] admission." *Id.* The BIA recognized that "[i]n

ordinary parlance, the phrase 'seeks admission' connotes a request for *permission* to enter." *Lemus-Losa*, 25 I. & N. Dec. at 743. "The problem, however, is that Congress has defined the concept of an 'applicant for admission' in an unconventional sense, to include not just those who are expressly seeking permission to enter, but also those who are present in this country without having formally requested or received such permission." *Id.* As a result, "many people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws." *Id.*

The BIA acknowledged that in a "prior decision, confusion about the proper meaning of the phrase 'seeks admission' led us to commit an error, which we now correct." *Id.* at 743 n.6. In the prior decision, the members of the BIA "declared ourselves 'at a loss' to explain Congress's inclusion of the word 'again' in [§ 1182(a)(9)(B)(i)(II)], since the rest of the statutory language did not seem to require the alien to have previously 'applied for admission' in the ordinary sense of that phrase." *Id.* (quoting *In re Lemus-Losa*, 24 I. & N. Dec. 373, 376 n.3 (BIA 2007)). The BIA explained that "[b]ecause we did not then understand that Congress was using the phrase 'seeks admission' as a term of art, we presumed that the word 'again' must have been inserted into the statute through a drafting error." *Id.* And here is the crucial point for our case:

> What we failed to discern is that *all* aliens who have accrued past periods of "unlawful presence" in the United States have necessarily been "applicants for admission" at some point in the past. That is, they had either been *true* applicants for admission at some point (in that they had entered the United States with visas or other entry documents before their presence became unlawful) or they had entered unlawfully or been

> paroled into the United States but were deemed *constructive* applicants for admission by operation of [the deeming provision of § 1225(a)(1)]. Thus, any alien who applies for admission to the United States after accruing a prior period of unlawful presence is, in a very meaningful (if sometimes artificial) sense, "*again* seek[ing] admission."

*Id*. (second alteration in original). The BIA thus explained that the deeming provision treats an unadmitted illegal alien as an applicant for admission. Because an *actual* applicant for admission would have been seeking admission, the unadmitted illegal alien is also treated as if he were seeking admission during his period of unlawful presence. So when an alien with a prior period of unlawful presence reenters and applies for admission for the first *actual* time, the INA treats him as someone "who *again* seeks admission." 8 U.S.C. § 1182(a)(9)(B)(i)(II) (emphasis added). The BIA accordingly treated a constructive applicant for admission as someone who was seeking admission.

The informed judgment of the BIA as to how the INA operates shows that the panel erred when interpreting the statute.[6] The panel was correct that Barbosa da Cunha was not "seeking admission" in an ordinary sense.[7] But it was a mistake to conclude that an alien who

---

[6] *See Singh v. Bondi*, 139 F.4th 189, 202 n.7 (2d Cir. 2025) ("In an agency case in particular, the reviewing court will go about its task with the agency's body of experience and informed judgment, among other information, at its disposal.") (alteration omitted) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024)).

[7] Those opinions that agree with the panel have similarly relied on the ordinary meaning of "seeking admission." *See Lopez-Campos*, 175 F.4th at 722-23 ("Contemporary dictionary definitions of 'seek' or 'seeking' confirm the words' requirement that the noncitizen engage in some affirmative act

is not *actually* seeking admission is not *constructively* seeking admission for purposes of the INA. As the BIA has recognized, the deeming provision requires that an unadmitted illegal alien who is not *actually* seeking admission be treated as if he were.

The panel dismissed the significance of the BIA's decision in *Lemus-Losa*. The panel wrote that "even if *Lemus-Losa* were correct, it would not support the government's position in this case" because "even if noncitizens like [Barbosa da Cunha] are construed as having sought admission at some point in the past, it does not follow that they are presently seeking admission." *Barbosa da Cunha*, 175 F.4th at 83. The panel argued that "for *Lemus-Losa*'s interpretation of Section 1182(a)(9) to work, noncitizens who 'again seek admission' must have at some point stopped seeking admission. But merely departing the country does not necessarily end one's process of 'seeking admission' because, as the BIA recognized, 'many aliens will be outside the United States and seeking admission from abroad.'" *Id.* (alteration omitted) (quoting *Lemus-Losa*, 25 I. & N. Dec. at 741).

That response misses the point. If an alien is *constructively* seeking admission by virtue of his illegal presence, then he is no longer seeking admission when he ends his illegal presence. If the alien later *actually* applies for admission from abroad, he would be

---

or attempt towards 'admission.'"); *Hernandez Alvarez*, 175 F.4th at 1267-68 ("Congress has not specifically defined 'seeking.' The term, which functions as an adjectival modifier of the noun 'an alien,' must be afforded its ordinary meaning—indicating an affirmative step of search or pursuit."); *Castañon-Nava v. DHS*, 175 F.4th 828, 846 (7th Cir. 2026) (opinion of Lee, J.) ("[P]rominent dictionaries defined the verb 'to seek' to mean: 'to resort to'; 'to go to'; 'to go in search of'; 'look for'; 'acquire or gain'; 'aim at'; 'to make an attempt.'"); *Buenrostro-Mendez*, 166 F.4th at 511 (Douglas, J., dissenting) ("The ordinary meaning of 'seek' requires some present, active action on the seeker's part.").

seeking admission for the second time. That was what the BIA explained: "[A]ny alien who applies for admission to the United States after accruing a prior period of unlawful presence is … '*again* seek[ing] admission.'" *Lemus-Losa*, 25 I. & N. Dec. at 743 n.6 (second alteration in original). In fact, the alien would not need to leave the country to file a second application. Under the INA, "*all* aliens who have accrued past periods of 'unlawful presence' in the United States have necessarily been 'applicants for admission.'" *Id.* If after accruing a past period of unlawful presence the alien applied for an adjustment of status, the alien would be "*again* seek[ing] admission." *Id.* (alteration in original).

In any event, this case does not require a court to decide when exactly an alien would be *again* seeking admission. The detention provision does not require the alien to be seeking admission for a second time. It requires only that the alien be considered to be "seeking admission" while he is considered to be an applicant for admission. 8 U.S.C. § 1225(b)(2)(A). Because Barbosa da Cunha was unadmitted and illegally present when arrested and inspected, he was "deemed to be 'seeking admission' under the immigration laws." *Lemus-Losa*, 25 I. & N. Dec. at 743. And that means the detention provision applied to him.

**C**

It is common—in the immigration context and elsewhere—that a statute will treat a person as doing at law something he is not actually doing. Frequently a "linguistic point is not dispositive. 'When the American legal system interprets a text, the process often looks nothing like a straightforward search for linguistic meaning.' The ultimate objective is to determine the meaning the law assigns to the text and therefore its legal effect." *United States v. Scott*, 990 F.3d

94, 128 (2d Cir. 2021) (Menashi, J., concurring in part and concurring in the judgment) (footnote omitted) (quoting William Baude & Stephen E. Sachs, *The Law of Interpretation*, 130 Harv. L. Rev. 1079, 1088 (2017)).

When a lawful permanent resident seeks to reenter the country, for example, Congress has directed that he "shall not be regarded as seeking an admission into the United States for purposes of the immigration laws." 8 U.S.C. § 1101(a)(13)(C). Even though that is what the lawful permanent resident is *actually* doing as a matter of plain meaning, the law treats him as if he were not.

To take another illustrative example, a regulation of the Department of Transportation determines when an employee has "refused to take a drug test." 49 C.F.R. § 40.191(a). The regulation explains that "[a]s an employee, you have refused to take a drug test if you" (1) "[f]ail to appear for any test (except a pre-employment test) within a reasonable time," *id.* § 40.191(a)(1); (2) "[f]ail to remain at the testing site until the testing process is complete," *id.* § 40.191(a)(2); or (3) "[f]ail to provide a sufficient amount of specimen when directed," *id.* § 40.191(a)(5). In none of these circumstances has the employee directly or even necessarily *refused* to take the drug test. But the regulation *deems* the employee to have refused. The regulation later explains that "[a]s an employee, if you refuse to take a drug test, you incur the consequences specified under DOT agency regulations." *Id.* § 40.191(c). Those consequences apply not only to those who have *actually* refused the test but also to those who have *constructively* refused. *See, e.g.*, *Bass v. Fed. Motor Carrier Safety Admin.*, 817 F. Supp. 3d 1, 4 (D.D.C. 2025) (explaining that an employee was "deemed to have refused the second drug test" because he left "the collection site before a drug testing process [was] complete") (internal quotation marks omitted).

A statute in Massachusetts requires an optometrist registered under state law to apply for and to take an examination if he wants to engage in "the use and prescription of therapeutic pharmaceutical agents." Mass. Gen. Laws ch. 112, § 68C(b). The statute then provides that "[a]n optometrist licensed in another jurisdiction shall be *deemed* an applicant under this section by the board of registration in optometry." *Id.* § 68C(c) (emphasis added). The board then requires those *constructive* applicants to meet the standards set for *actual* applicants. *See id.*

It makes sense that Massachusetts would treat an optometrist with an out-of-state license *as if* he were seeking the same permission to practice that Massachusetts requires of in-state licensees. It makes sense that the Yankees would treat a fan who snuck by the ticket counter *as if* he were seeking a paid ticket to the game. And it makes sense that Congress would treat an alien who entered the United States without being admitted *as if* he were seeking a lawful entry to the country. What does not make sense is the panel's inconsistent interpretation of the INA. The panel's view is that an unadmitted illegal alien is treated as an "applicant for admission" by virtue of his unlawful presence but, at the same time, he cannot be treated as "seeking admission" unless he has literally applied for admission at the border. Yet Congress directed that an unadmitted illegal alien must be treated as an applicant for admission for purposes of the INA. It violates that mandate to refuse to treat that alien *as if* he were doing what all applicants for admission are necessarily doing: seeking admission.

**D**

The panel offered several other arguments to defend its inconsistent application of the deeming provision. None is

persuasive. First, the panel offered a counterintuitive and implausible interpretation of the phrase "or otherwise" in 8 U.S.C. § 1225(a)(3). But that provision indicates that an applicant for admission is necessarily seeking admission. Second, the panel insisted that the government's interpretation renders part of the detention provision superfluous. But the panel's interpretation creates a much worse superfluity problem. Third, the panel claimed to find support for its position in the opinion of the Supreme Court in *Jennings v. Rodriguez*, 583 U.S. 281 (2018). But that decision undermines the panel's interpretation of the detention provision. Fourth, the panel insisted that the executive branch interpreted the detention provision contemporaneously with its enactment not to apply to unadmitted illegal aliens. But the opposite is true. Fifth, the panel relied on the canon of constitutional avoidance. But the government's interpretation of the detention provision raises no constitutional problems.

**1**

The panel sought support for its interpretation of the detention provision in other provisions of the INA. But the statutory context shows that its interpretation is wrong.

The panel identified 8 U.S.C. § 1225(a)(3), which provides that "[a]ll aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." The government argues that § 1225(a)(3) supports its interpretation of the detention provision because the language "applicants for admission or otherwise seeking admission" indicates that applicants for admission are a subset of those who are seeking

admission. And that means that applicants for admission are necessarily seeking admission.

The panel acknowledged that "the government is correct that 'or otherwise' can sometimes mean 'in a different way or manner.'" *Barbosa da Cunha*, 175 F.4th at 78. When the librarian says not to "engage in loud conversation or otherwise disrupt the library atmosphere," she has identified loud conversation as one way to disrupt the library atmosphere. But the panel said that the same phrase "can also simply 'refer to something that is different from something already mentioned.'"[8] The online dictionary on which the panel relied gives this example: "Intentionally *or otherwise*, they never told her about the party." That sentence conveys that they never told her about the party either intentionally or in another way that was *not* intentional—such as accidentally or unwittingly.

The panel decided that § 1225(a)(3) reflects the latter disjunctive usage based on its own question-begging assertion that "'applicant for admission' is not narrower or more specific than 'alien seeking admission.'" *Barbosa da Cunha*, 175 F.4th at 79. The panel concluded that § 1225(a)(3) "applies to applicants for admission, and also applies to three further categories of noncitizens, which may overlap with but are not the same as 'applicant for admission.'" *Id.* at 80. But the concession that the categories *overlap* undermines the panel's argument. If the categories *overlap*, then it cannot be said that the statute uses the phrase "or otherwise" to "refer to something that is different" from being an applicant for admission. *Id.* at 78. If what follows "or otherwise" overlaps with what precedes it, then the

[8] *Barbosa da Cunha*, 175 F.4th at 78 (quoting *Or otherwise*, Merriam-Webster Online, https://perma.cc/9F9H-PH6Q).

phrase is being used in the conjunctive sense to refer to a "subset-superset" relationship. *Id.*[9]

In fact, a subset-superset relationship is exactly what § 1225(a)(3) describes. The panel was wrong that "applicant for admission" is a more "general" term than the "more specific" category of "seeking admission." *Id.* at 79-80. Even circuits that have ultimately agreed with the panel recognize that "a non-applicant for admission may nevertheless be seeking admission." *Lopez-Campos*, 175 F.4th at 727. An "arriving alien who is a stowaway," for example, "is not eligible to apply for admission" and "[i]n no case may a stowaway be considered an applicant for admission." 8 U.S.C. § 1225(a)(2). But such an alien may nevertheless be "otherwise seeking admission," in which case he must be inspected by an immigration officer pursuant to § 1225(a)(3) and will be determined to be inadmissible. *See id.* § 1182(a)(6)(D); 8 C.F.R. § 235.1(f)(4).

The same goes for alien crewmen. With the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), the Immigration and Naturalization Service recognized that § 1225(a)(3) "now clearly requires the inspection of all alien crewmen seeking admission or readmission to or transit through the United States."[10] An arriving alien crewman must be inspected

---

[9] Moreover, the panel's interpretation renders the word "otherwise" superfluous. "[T]he same reading would be accomplished if the statute simply read 'who are applicants for admission *or* seeking admission.'" *Guerrero Orellana*, 2026 WL 2352042, at *22 (Dunlap, J., dissenting). "It is our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (quoting *Inhabitants of Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)).

[10] Inspection of Alien Crewmembers; 90-Day Modified Inspection Procedure, 62 Fed. Reg. 43676, 43677 (Aug. 15, 1997).

pursuant to § 1225(a)(3) and must be determined to be "admissible." 8 U.S.C. § 1282(a); *see also* 8 C.F.R. § 252.1(c) (explaining that an alien crewman must "establish to the satisfaction of the inspecting officer that he or she is not inadmissible under any provision of the law"); *id.* § 252.3(b)(2) (describing an alien crewman who "[s]eeks admission for a period of less than 29 days"). If the alien crewman receives a conditional permit to land temporarily in the United States, the immigration officer endorses a form "to show the date and place of *admission* and the type of conditional landing permit." *Id.* § 252.1(e) (emphasis added). But although the alien crewman is *seeking admission* in the form of such a permit, he is not an *applicant for admission* because an alien "permitted to land temporarily as an alien crewman shall not be considered to have been admitted." 8 U.S.C. § 1101(a)(13)(B). So by applying for the permit, the alien is not an applicant for admission. But such an alien must be inspected because he is otherwise seeking admission.

A similar framework applies to a lawful permanent resident under some circumstances. "An alien lawfully admitted for permanent residence in the United States" will generally "not be regarded as seeking an admission into the United States for purposes of the immigration laws." *Id.* § 1101(a)(13)(C). But he becomes regarded as seeking admission if, for example, he "has been absent from the United States for a continuous period in excess of 180 days" or "has engaged in illegal activity after having departed the United States." *Id.* § 1101(a)(13)(C)(ii)-(iii). Those "lawful permanent residents who fall under any of 8 U.S.C. § 1101(a)(13)(C)'s scenarios … are not 'applicants for admission' but may still 'seek admission' in [those] circumstances." *Lopez-Campos*, 175 F.4th at 727. The alien who has already been admitted for permanent residence but is treated as seeking admission is not an applicant for admission. But

he must be inspected as an alien "otherwise seeking admission" and must be determined to be admissible before reentering the country. 8 U.S.C. § 1225(a)(3).

The conclusion of the panel that applicants for admission are not a subset of those aliens seeking admission was based on its own linguistic assumptions rather than the legal framework of the INA. The treatment of stowaways and crewmen in § 1225 itself illustrates the point. Most aliens seeking admission will be applicants for admission, but not *every* alien seeking admission is such an applicant. That is why the INA refers to aliens "who are applicants for admission or otherwise seeking admission." *Id.* Applicants for admission are a subset of aliens seeking admission.

**2**

The panel suggested that the government's reading of the detention provision creates a superfluity problem by understanding the phrases "applicant for admission" and "seeking admission" each to refer to the same category of people. *See Barbosa da Cunha*, 175 F.4th at 75. As just explained, the two terms are not coextensive because some aliens are seeking admission without being applicants for admission. To the extent that the detention provision applies to an "alien seeking admission" only "in the case of an alien who is an applicant for admission," however, the combination of the two terms creates some redundancy. Yet "that redundancy does not give this court a 'license to rewrite another portion of the statute contrary to its text.'" *Buenrostro-Mendez*, 166 F.4th at 503 (alteration omitted) (quoting *Barton v. Barr*, 590 U.S. 222, 239 (2020)).

In fact, "there is 'no canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing.'" *Id.* (quoting *Jennings*, 583 U.S. at

303). And the exceptions to the detention provision "illustrate that this particular statute was drafted with redundancy from the start." *Hernandez Alvarez*, 175 F.4th at 1296 (Lagoa, J., dissenting). For example, § 1225(b)(2)(B)(iii) provides that the detention provision "shall not apply" to an alien "who is a stowaway." 8 U.S.C. § 1225(b)(2)(B)(iii). Earlier in the same section, however, the statute provides that "[i]n no case may a stowaway be considered an applicant for admission." *Id.* § 1225(a)(2). Because the detention provision applies only "in the case of an alien who is an applicant for admission," *id.* § 1225(b)(2)(A), it could not apply to a stowaway even without the express exception of § 1225(b)(2)(B)(iii). But Congress inserted that express exception anyway. And Congress inserted another express exception for an alien "who is a crewman," *id.* § 1225(b)(2)(B)(i), even though a crewman is not an applicant for admission either, *see supra* Part I-D-1.

These express exceptions create redundancy because the exceptions overlap with categories of aliens already excluded from the category of "applicants for admission." But "some overlap is common in laws of this kind that set forth qualifications to obtain a government benefit" or indeed to obtain entry to the United States. *Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.). Legislators "sometimes employ overlap or redundancy so as to remove any doubt and make doubly sure" who will be entitled to what. *Id.* The Supreme Court has explained that "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication," and the Court "has often recognized: 'Sometimes the better overall reading of the statute contains some

redundancy.'" *Barton*, 590 U.S. at 239 (quoting *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019)).[11]

Even so, the panel's interpretation "creates a far worse surplusage problem than the one it purports to solve." *Hernandez Alvarez*, 175 F.4th at 1296 (Lagoa, J., dissenting). At the outset of § 1225, Congress inserted the deeming provision of § 1225(a)(1) to provide that an unadmitted illegal alien "shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). According to the panel's interpretation, however, Congress proceeded to insert the phrase "seeking admission" throughout § 1225 in order to ensure that unadmitted illegal aliens would be *excluded* from every operative provision in § 1225 in which the phrase "applicant for admission" appears.

There are two such provisions in § 1225. First, the statute directs that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in *seeking admission* to the United States." *Id.* § 1225(a)(5) (emphasis added). According to the reasoning of the panel, this provision would not apply to a constructive applicant for admission. Because the unadmitted illegal

---

[11] *See also Cirrus Rojas*, 183 F.4th at 935 (Sykes, J., dissenting) ("[W]hen an old and complex statute like the INA has been repeatedly amended and is riddled with legal fictions, terms of art, and redundancies, incongruities are sure to exist. As Judge Learned Hand said a century ago, our immigration laws are 'so confused, contradictory, minute, and manifold' that they 'inevitably produce such caprices.'") (alteration omitted) (quoting *United States ex rel. Georgas v. Day*, 43 F.2d 917, 919 (2d Cir. 1930)).

alien is not actually *seeking admission*, he would not need to provide information about doing so under oath.[12]

Second, the statute directs that "[i]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). According to the panel, this provision also does not apply because the unadmitted illegal alien is not *seeking admission*. But if neither of these provisions applies, then *no* provision of § 1225 applies to an unadmitted illegal alien who is a constructive applicant for admission. It would make no sense for Congress to have opened that section by announcing that such aliens must be treated as applicants for admission and then to write operative provisions that never apply to them.

It is true that the term *applicant for admission*—without an accompanying *seeking admission*—"appears once in § 1229a, in § 1229a(c)(2), to define the burden applicants for admission bear in removal proceedings." *Buenrostro-Mendez*, 166 F.4th at 504 n.10. "But if this is the only reason 'applicant for admission' extends beyond 'arriving aliens,' then why would Congress not merely specify in [§ 1229a(c)(2)] that the provision applies to both arriving aliens and those already present?" *Id.* It is "a bizarre construction" under which "Congress established a broad definition [of 'applicant for

[12] The provision also undermines the panel's interpretation because in § 1225(a)(5) "Congress used the phrase 'seeking admission' simply to describe the state of an applicant." *Buele Morocho*, 2026 WL 2546223, at *18 (Mascott, J., dissenting). This provision clearly does not describe "[a]liens 'seeking admission'" as a "subset standing apart from a broader applicant class." *Id.*

admission'] in § 1225 but, despite repeatedly using the term in § 1225, used the full breadth of the definition only in a corollary provision in a completely independent section of the code." *Id.* We must reject such a bizarre construction in favor of a sensible one "because it is our role to make sense rather than nonsense out of the *corpus juris*." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991) (Scalia, J.).

The more sensible view is that the detention provision—just as it uses the redundant phrase "not clearly and beyond a doubt"—"describes the same alien twice: once using the operative term in the introductory clause and once using ordinary English in the operative clause. That is a doublet, not surplusage." *Hernandez Alvarez*, 175 F.4th at 1296 (Lagoa, J., dissenting). A doublet reflects "two ways of saying the same thing that reinforce its meaning," and "the presumption against surplusage does not apply to doublets." *Doe v. Boland*, 698 F.3d 877, 881 (6th Cir. 2012) (Sutton, J.). "Doublet redundancy in a single sentence is a minor interpretive cost," while "[n]ullifying the reach of a deeming provision across an entire statutory section is not." *Hernandez Alvarez*, 175 F.4th at 1297 (Lagoa, J., dissenting). That explanation is preferable to the interpretation of the panel under which the deeming provision serves no meaningful purpose and the reference to an "applicant for admission" in the detention provision "ultimately is surplusage." *Buele Morocho*, 2026 WL 2546223, at *17 (Mascott, J., dissenting).

**3**

The panel asserted that "the Supreme Court has long understood IIRIRA exactly how Petitioner does." *Barbosa da Cunha*, 175 F.4th at 84 (citing *Jennings*, 583 U.S. at 287). That would be big news if it were true. After all, "vertical *stare decisis* is absolute" and would preclude alternative views from the circuit courts. *Ramos v.*

*Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring in part). But it is not true. The Supreme Court has not addressed the question in this case, which is why there is a circuit split.

In *Jennings*, the Supreme Court observed that "at the Nation's borders and ports of entry," the government "must determine whether an alien seeking to enter the country is admissible." *Jennings*, 583 U.S. at 287. The Court then described the statutory scheme. It noted that "an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission,'" *id.* (quoting 8 U.S.C. § 1225(a)(1)), and that "[a]pplicants for admission must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law," *id.* (quoting 8 U.S.C. § 1225(a)(3)). Later on, the Court wrote that "immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)" and that "[i]t also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289. Based on this language, the panel concluded that the Supreme Court has already held that § 1225 governs the detention of aliens *at the border* and § 1226 governs the detention of aliens *already inside* the country.

The Supreme Court has "cautioned that 'general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Olivier v. City of Brandon*, 607 U.S. 552, 565 (2026) (quoting *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023)). And in *Jennings* the Supreme Court was not considering the application of § 1225 to constructive applicants for admission.

Even so, nothing in *Jennings* supports the panel's interpretation. The Supreme Court said that the government may "detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)" and may "detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings*, 583 U.S. at 289. That description is entirely consistent with the view that the category of "aliens seeking admission" includes not only arriving aliens at the border but also those unadmitted aliens who are constructively treated as applicants for admission—in the same way as arriving aliens—because they have not been admitted. Those applicants for admission are also "aliens seeking admission." Only the panel's question-begging assumption that an applicant for admission is not seeking admission could lead to the conclusion that *Jennings* endorses its interpretation.

In fact, *Jennings* undermines the panel's argument. The Supreme Court said that the detention provision of § 1225(b)(2) "serves as a catchall provision that applies to *all* applicants for admission not covered by § 1225(b)(1)." *Id.* at 287 (emphasis added). The panel agrees that Barbosa da Cunha is (1) an applicant for admission and (2) not covered by § 1225(b)(1), which applies to "aliens arriving in the United States," 8 U.S.C. § 1225(b)(1), and to unadmitted illegal aliens who have been continuously present for less than two years, *see id.* § 1225(b)(1)(A)(iii)(II). The *Jennings* opinion therefore anticipates that an applicant for admission such as Barbosa da Cunha must fall under the "catchall provision" of § 1225(b)(2) because he is not covered by § 1225(b)(1). The Supreme Court in *Jennings* explained that "applicants for admission fall into one of two

categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Jennings*, 583 U.S. at 287.[13]

The panel assumed that the distinction was that § 1225 applies to aliens at the border and § 1226 applies to aliens already inside the country. But the INA relies instead on the distinction between *unadmitted* aliens—whether or not inside the country—and admitted aliens. We know that § 1226(a) and § 1226(c) do not apply to *all* aliens who are already in the country. An alien might be paroled into the country, for example, but "parole of such alien shall not be regarded as an admission." 8 U.S.C. § 1182(d)(5)(A). The paroled alien, although inside the country, remains an applicant for admission and may later be detained pursuant to § 1225. The Court recognized as much in *Jennings*. *See Jennings*, 583 U.S. at 288 (explaining that "when the purpose of the parole has been served, 'the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States'") (quoting 8 U.S.C. § 1182(d)(5)(A)). Rather than endorsing the interpretation of the panel, *Jennings* relied on the key distinction between unadmitted and admitted aliens.[14]

---

[13] The *Jennings* approach under which all applicants for admission are covered by § 1225 makes much more sense than the panel's approach under which (1) only two types of applicants for admission—arriving aliens and unadmitted illegal aliens who have been present for less than two years—are covered by § 1225, and (2) a third type of applicants for admission—unadmitted illegal aliens who have been present for two years or more—is not covered by § 1225 at all but falls under § 1226.

[14] The Immigration and Naturalization Service estimated that "[a]bout 2.1 million, or 41 percent, of the total undocumented population in 1996 are nonimmigrant overstays. That is, they entered legally on a temporary basis and failed to depart." Immigration and Naturalization Service, U.S.

The panel claimed that "the Executive Branch has for nearly three decades acted inconsistently with the newfound interpretation" that it advanced in this case. *Barbosa da Cunha*, 175 F.4th at 91. I agree that while we must "exercise independent judgment in determining the meaning of statutory provisions," in exercising that judgment "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright*, 603 U.S. at 394.[15]

At the same time, "a 'long-established practice' does not justify a rule that denies statutory text its fairest reading." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). The panel acknowledged that principle by stating that "[i]f judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives." *Barbosa da Cunha*, 175 F.4th at 96 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 654-55 (2020)). In *Bostock*, the

---

Department of Justice, Illegal Alien Resident Population (last modified Aug. 11, 1999), https://perma.cc/QV9N-FP73. So the population of *admitted* illegal aliens was significant when Congress revised these statutes—which meant that the detention authority of § 1226 would apply to a large population not covered by § 1225. *See Chen v. Almodovar*, No. 25-CV-9670, 2026 WL 100761, at *4 (S.D.N.Y. Jan. 14, 2026) (identifying the categories of aliens subject to § 1225(b)(1), § 1225(b)(2), § 1226(a), and § 1226(c)).

[15] *See also* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908, 916 (2017) ("Under the traditional interpretive approach, American courts 'respected' longstanding and contemporaneous *executive* interpretations of law as part of a practice of deferring to longstanding and contemporaneous interpretation *generally*.").

Supreme Court "did not hesitate to reject what had been the decades-old agency and judicial view of Title VII when it held that the text unambiguously covered sexual-orientation discrimination." *Lopez-Campos*, 175 F.4th at 758 (Murphy, J., dissenting). So a longstanding executive branch interpretation is not always decisive.

In this case, however, the evidence on which the panel relied does not establish that the executive branch previously maintained a longstanding interpretation contrary to the view that an unadmitted illegal alien is subject to detention under § 1225(b)(2). The panel opinion quoted a sentence from the agency responses to comments when the Immigration and Naturalization Service promulgated an interim rule in 1997. In that sentence, the INS wrote: "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination."[16] Because the INS wrote that an unadmitted illegal alien will be eligible for bond, the panel concluded that the INS must have understood unadmitted illegal aliens to be detained pursuant to the discretionary detention provision of § 1226(a) rather than the mandatory detention provision of § 1225(b)(2).

But that conclusion contradicts the actual rule that the INS adopted. Under § 1225(b)(1)(A)(iii), the Attorney General has the discretion to subject to the expedited removal procedures of § 1225(b)(1) an alien "who has not been admitted or paroled into the United States"—that is, an unadmitted illegal alien—who has not shown that he has been "physically present in the United States

[16] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

continuously for the 2-year period" prior to a determination of inadmissibility. 8 U.S.C. § 1225(b)(1)(A)(iii)(II). The Attorney General exercised that discretion in the rule on which the panel relied. The rule stated that aliens who "have entered the United States without having been admitted or paroled"—that is, unadmitted illegal aliens—"who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility" will be subject to "the provisions of section 235(b)(1) of the Act." 62 Fed. Reg. at 10355. Section 235(b)(1) of the INA is the expedited removal provision codified at 8 U.S.C. § 1225(b)(1). Then the rule continued:

> An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility *shall be detained in accordance with section 235(b)(2) of the Act* for a proceeding under section 240 of the Act.

*Id.* (emphasis added). Section 235(b)(2) of the INA is the detention provision of § 1225(b)(2). So this is a contemporaneous interpretation of the government—issued when the detention provision was adopted—stating that an unadmitted illegal alien is subject either to expedited removal under § 1225(b)(1) or to the detention provision of § 1225(b)(2). *See Jennings*, 583 U.S. at 287 ("[A]pplicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)."). And this remains the interpretation of the executive branch. The current regulation continues to provide that an unadmitted illegal alien is either subject to expedited removal or "shall be detained" pending removal proceedings "in accordance with" § 1225(b)(2). 8 C.F.R. § 235.3(b)(1)(ii). Thus, the "regulation

enacted in 1997 that is still on the books today provides the same interpretation of § 1225(b)(2)(A) for which the government advocates," providing "further evidence of the executive branch's original understanding of IIRIRA." *Rodriguez Vazquez*, 183 F.4th at 1200 (Bea, J., dissenting). The understanding the executive branch expressed in 1996 is consistent with its position in 2026.

The panel assumed that because an unadmitted illegal alien received a bond hearing, the government must have understood the alien to be detained pursuant to § 1226(a) rather than § 1225(b)(2). But the contemporaneous interpretation on which the panel relied said the opposite: An unadmitted illegal alien is subject either to expedited removal under § 1225(b)(1) or to detention pending removal proceedings under the detention provision of § 1225(b)(2).

What to make of the sentence in the commentary accompanying the 1997 interim rule stating that unadmitted illegal aliens "will be eligible for bond and bond redetermination"? Perhaps the government was exercising a type of enforcement discretion because it lacked the resources to mandatorily detain every alien subject to § 1225(b)(2). Both the executive branch and the Supreme Court have recognized that "[d]ue to consistent and significant funding shortfalls, … DHS has never had 'sufficient detention capacity to maintain in custody every single person described in section 1225.'"[17] The government's "enforcement discretion over arrests and prosecutions extends to the immigration context," *United States v. Texas*, 599 U.S. 670, 679 (2023), and the Supreme Court has approved the exercise of such enforcement discretion even when a

---

[17] *Biden v. Texas*, 597 U.S. 785, 792 (2022) (quoting DHS, Explanation of the Decision to Terminate the Migrant Protection Protocols 28 (Oct. 29, 2021), https://perma.cc/YY2P-EM88).

statute uses mandatory language such as "shall," *id.* at 682. The Supreme Court has expressly reserved judgment on "whether the detention requirement in section 1225(b)(2)(A) is subject to principles of law enforcement discretion," and the government has previously argued that it is. *Biden*, 597 U.S. at 803 n.5.

That question is not before us in this case, which concerns whether an unadmitted illegal alien is subject to the detention provision of § 1225(b)(2) in the first place. The point here is that the government's previous exercise of enforcement discretion is not probative of the meaning of § 1225(b)(2). The panel believed that by stating that an unadmitted illegal alien may receive a bond hearing, the government had interpreted § 1225(b)(2) not to apply to such an alien. But the panel failed to read the actual rule on which it relied, which expressly stated that an unadmitted illegal alien—because he is an applicant for admission—is subject to detention under § 1225(b)(2).

**5**

To justify its counterintuitive reading of the detention provision, the panel invoked the canon of constitutional avoidance. Pursuant to the canon, "[w]hen 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Jennings*, 583 U.S. at 296 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The panel explained that "even if there were ambiguity in the statutory text, we would reject the government's interpretation because of the grave constitutional concerns it raises." *Barbosa da Cunha*, 175 F.4th at 93.

The panel said that the government's interpretation raises "constitutional alarms" for three reasons. *Id.* at 94. First, "[w]hile

noncitizens can be detained temporarily to 'give immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity,' that is not what is going on here, where detention is mandatory regardless of these risks." *Id.* (alteration and citation omitted) (quoting *Jennings*, 583 U.S. at 286). The panel saw "no basis for subjecting all noncitizens in Petitioner's shoes to categorical detention without bond." *Id.* Second, "[t]he government's interpretation would also likely subject Petitioner to unconstitutionally prolonged detention" because his removal proceedings could take a long time. *Id*. Third, "[t]hese concerns are compounded by the fact that noncitizens have no right to counsel and are therefore often unrepresented in removal proceedings. Unlike criminals detained for punitive purposes, noncitizens like Petitioner thus lack the ability to reliably challenge their detention or the conditions in which they are being held." *Id.* (citation omitted).

None of these points reflects plausible constitutional violations. I will address the panel's concerns in reverse order. First, "[i]t is well known that immigrants in this country 'have no specific right to counsel' in immigration proceedings, even for life-altering proceedings such as detention and removal." *Watson v. United States*, 865 F.3d 123, 136 (2d Cir. 2017) (Katzman, C.J., concurring in part and dissenting in part) (quoting *Aris v. Mukasey*, 517 F.3d 595, 600 (2d Cir. 2008)). The panel did not and could not say otherwise. But the panel invented a quasi-right to counsel by suggesting that the lack of counsel could "compound[]" other constitutional concerns. Even taken on its own terms, the panel opinion said that the lack of a right to counsel was relevant only insofar as there are other *actual* constitutional concerns with the government's interpretation. But there are no actual concerns.

Second, to support its view that the government's interpretation would subject Barbosa da Cunha to unconstitutionally prolonged detention, the panel invoked *Demore v. Kim*. In *Demore*, the Supreme Court said that detention pursuant to § 1226(c)—another mandatory detention provision of the INA—"lasts roughly a month and a half in the vast majority of cases in which [§ 1226(c)] is invoked, and about five months in the minority of cases in which the alien chooses to appeal." 538 U.S. 510, 530 (2003). As the panel noted, "[t]he Court explained that proceedings against 'criminal aliens' are typically completed so swiftly because they are prioritized by the Agency over the mine run of removal cases." *Barbosa da Cunha*, 175 F.4th at 95 (quoting *Demore*, 538 U.S. at 530 n.13). The panel then speculated that "[i]f the government is right that Section 1225(b)(2)(A) mandates detention of millions of non-criminal noncitizens, there is no reason to think that removal can be completed so swiftly for all or even most of those detained." *Id.* To support that speculation, the panel cited the finding of the Vera Institute of Justice that "the average wait time today for an initial decision in removal proceedings is more than two years." *Id.* at 95 n.12.[18]

There are three problems with the panel's analysis. The first problem is that the statistic on which the panel relied is misleading. The government maintains a priority calendar for detained aliens, so the time to completion of removal proceedings for *detained* aliens is significantly shorter than for *non-detained* aliens. "Since its creation in 1983," the Executive Office for Immigration Review "has prioritized all cases involving individuals in detention or custody, regardless of

[18] The Vera Institute of Justice is a think tank that aims "[t]o end the criminalization and mass incarceration of people of color, immigrants, and people experiencing poverty." Vera Institute of Justice, About Us, https://perma.cc/UP9T-FVJJ.

the custodian."[19] EOIR maintains "a performance metric" for immigration adjudicators "that 'ninety-five percent (95%) of all non-status detained removal cases should be completed within 60 days of filing of the Notice to Appear (NTA), reopening or recalendaring of the case, remand from the Board of Immigration Appeals (BIA), or notification of detention.'"[20] And a report of the Government Accountability Office "records the actual 'median number of days from case start to initial completion' for detained aliens for fiscal years 2016 through 2023. In 2023 it was 47 days; in 2022 it was 50 days; in 2021 it was 50 days; in 2020 it was 92 days; in 2019 it was 52 days; in 2018 it was 39 days; and in 2017 it was 40 days."[21]

As in *Demore*, the government prioritizes removal proceedings for detained aliens. So there is the same reason to believe that such an alien will be detained for only a "limited period." *Demore*, 538 U.S. at 526. If in the future the government were unable to maintain its priority calendar, that could be the subject of a future as-applied challenge to determine whether and to what extent the administrative changes presented a constitutional problem. But a federal court cannot invent a constitutional violation based on speculation that the government might not be able to meet the metrics it has met until

---

[19] *Mahdawi v. Trump*, 183 F.4th 103, 134 (2d Cir. 2026) (Menashi, J., concurring) (quoting Executive Office for Immigration Review, U.S. Department of Justice, PM 25-47: Case Priorities and Immigration Court Performance Measures at 2 (Sept. 12, 2025), https://perma.cc/K99B-Z2B9).

[20] *Id.* (alteration omitted) (quoting Executive Office for Immigration Review, *supra* note 19, at 7).

[21] *Id.* (alteration and footnote omitted) (quoting Government Accountability Office, GAO-25-106867: Immigration Courts: Actions Needed to Track and Report Noncitizens' Hearing Appearances (Dec. 19, 2024), https://perma.cc/7CWR-3A7N).

now. "A federal court does not sit to render a decision on hypothetical facts," *Wheeler v. Barrera*, 417 U.S. 402, 426-27 (1974), because "conjectural results are too remote and uncertain to furnish materials for judicial determination," *Chadwick v. Kelly*, 187 U.S. 540, 547 (1903).

The second problem is that the panel misunderstood the holding of *Demore*. The Supreme Court has explained why the detention in *Demore* raised *no* constitutional concerns while the detention it previously considered in *Zadvydas v. Davis*, 533 U.S. 678 (2001), *did* raise such concerns:

> In *Demore v. Kim*, we distinguished § 1226(c) from the statutory provision in *Zadvydas* by pointing out that detention under § 1226(c) has "a definite termination point": the conclusion of removal proceedings. As we made clear there, that "definite termination point"—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c).

*Jennings*, 583 U.S. at 304 (citation omitted) (quoting *Demore*, 538 U.S. at 529). In *Demore*, the Court acknowledged that an *indefinite* detention may raise constitutional concerns, but it held that the detention in that case was permissible precisely because a detention under § 1226(c) is neither "indefinite" nor "potentially permanent." 538 U.S. at 528 (quoting *Zadvydas*, 533 U.S. at 690-91). The fact that a § 1226(c) detention has "a definite termination point" made it "materially different" from the sort of detention that raised constitutional concerns in *Zadvydas*. *Id*. at 528-29. Indeed, *Zadvydas* itself recognized the distinction. The Court distinguished the provision at issue in that case from § 1226(c) based on the indefiniteness of the detention: "[I]mportantly," said the Court, "post-removal-period detention, *unlike detention pending a determination of removability* or during the

subsequent 90-day removal period, has no obvious termination point." *Zadvydas*, 533 U.S. at 697 (emphasis added).

The panel sought to recast *Demore* as if it announced a constitutional rule based on the *length* of an immigration detention. The Court in *Demore* expressly held, however, that a mandatory detention pending removal proceedings is constitutional because such a detention is not "indefinite" but has a "definite termination point." 538 U.S. at 529. The decisions of the Supreme Court consistently reflect the view that "[t]he indefiniteness of the detention—not its mere length—implicate[s] the Due Process Clause." *Black v. Almodovar*, 156 F.4th 171, 183 (2d Cir. 2025) (Menashi, J., dissenting from the denial of rehearing en banc).

The detention provision in this case, § 1225(b)(2), authorizes detention only pending removal proceedings. Like the mandatory detention pending removal proceedings at issue in *Demore*, a detention under § 1225(b)(2) has a "definite termination point." *Demore*, 538 U.S. at 529. The holding of *Demore*—that mandatory detention pending removal proceedings creates no constitutional problem—resolves any challenge to a detention under § 1225(b)(2).

The third problem is that our circuit's case law has already addressed what happens when a mandatory detention pending removal proceedings becomes "unreasonably prolonged." *Black v. Decker*, 103 F.4th 133, 138 (2d Cir. 2024). Even assuming that our court has taken the correct side of a circuit split,[22] our court did not purport to hold that mandatory detention pending removal proceedings pursuant to § 1226(c) by itself raised constitutional concerns. "Far

---

[22] *But see Genalo v. Black*, No. 25-886, 2026 WL 1718025 (U.S. June 15, 2026) (granting certiorari on the question), *appeal dismissed per stipulation*, 2026 WL 2752021 (U.S. Sept. 16, 2026).

from invalidating § 1226(c) and upending its policy of mandatory detention, the *Black* panel held that, as a remedy for an as-applied challenge to unreasonably prolonged detention, a district court properly ordered the government to justify an individual petitioner's continued § 1226(c) detention at a bond hearing." *Black*, 156 F.4th at 192 (Chin & Carney, JJ., statement in support of the denial of rehearing en banc) (internal quotation marks, emphasis, and citations omitted).

Our court did not say that the mandatory detention statute was unconstitutional. Rather, our court held that the remedy of a bond hearing is available in an as-applied challenge once a specific detention has become unreasonably prolonged. *See Mahdawi*, 183 F.4th at 121 ("[I]n the event that removal proceedings involving a detained individual are unreasonably prolonged, this Court's precedent provides that a petitioner may file a habeas petition and challenge his detention 'on the ground that it has reached an unreasonable length.'") (alteration and footnote omitted) (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 852 (2d Cir. 2020)). The availability of this as-applied remedy should *lessen* the purported constitutional concerns with a mandatory detention statute. But the panel in this case went further than our court did in *Black* or *Velasco Lopez* to hold that a mandatory detention provision, on its face, "sounds constitutional alarms" based on the mere *possibility* that it might someday authorize lengthy detentions. *Barbosa da Cunha*, 175 F.4th at 94.

Third, the panel said that a statute that subjects aliens such as Barbosa da Cunha to "categorical detention without bond" would violate the Constitution because Barbosa da Cunha, "like many unlawfully present noncitizens, presents no risk of flight nor any danger to the community." *Id.* Such a statute would apparently "raise

serious constitutional questions, especially because the government has failed to explain how it would bear a 'reasonable relation' to any legitimate, non-punitive purpose." *Id.* at 95 (quoting *Zadvydas*, 533 U.S. at 690).

This argument proves too much. The panel did not dispute that if Barbosa da Cunha arrived at the border and presented himself for inspection, the government would properly detain him pursuant to § 1225(b)(2). *See, e.g.*, *Abdyl-Salam v. Blanche*, No. 26-CV-1132, 2026 WL 2030067, at *2 (W.D.N.Y. July 13, 2026) (concluding that even under *Barbosa da Cunha* "aliens who were encountered at or near the border" are detained pursuant to § 1225(b)(2)). And if Barbosa da Cunha—in addition to being a constructive applicant for admission based on his illegal presence—became an actual applicant for admission by seeking an adjustment of status, the government also could detain him pursuant to § 1225(b)(2). But in neither of these circumstances would the government be required to establish a risk of flight or danger to the community. If the arriving alien or the literal applicant may permissibly be detained—without a showing that he is a flight risk or dangerous—then what makes the detention of an unadmitted illegal alien uniquely illegitimate and punitive?

Underlying the panel opinion is the suspicion that § 1225(b)(2) is facially unconstitutional. The panel argued that "[w]hatever the duration of detention, it must still serve its purported immigration purpose, which must outweigh the individual's constitutionally protected interest in avoiding physical restraint." *Barbosa da Cunha*, 175 F.4th at 94-95 (internal quotation marks, alteration, and citation omitted). The panel concluded that "[i]n *Demore*, that justification was satisfied because Section 1226(c) applies only to 'criminal aliens.'" *Id.* at 95 (citing *Demore*, 538 U.S. at 517-23). But § 1225(b)(2) does *not* apply only to criminal aliens, and there is no way to read that statute

to so limit its scope. Based on the logic of the panel opinion, therefore, § 1225(b)(2) is unconstitutional.

That is an extraordinary suggestion—and it is obviously incorrect. "Detention during removal proceedings is a constitutionally permissible part of that process." *Demore*, 538 U.S. at 531. Congress may constitutionally require the continued detention of an alien pending removal proceedings even when the government has "made no determination that [an individual alien] posed either a danger to society or a flight risk." *Id.* at 514. The government may "deny bail to the detainees 'by reference to the legislative scheme' even without any finding of flight risk." *Id.* at 524 (quoting *Carlson v. Landon*, 342 U.S. 524, 543 (1952)). The "Court's longstanding view" is "that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Id.* at 526. Congress does not need to mandate individualized determinations to conclude that such detention prevents those aliens "from fleeing prior to or during their removal proceedings." *Id.* at 528. The panel might prefer even more individualized hearings than the current immigration framework allows, but the Supreme Court has "emphasized that 'reasonable presumptions and generic rules,' even when made by the [executive branch] rather than Congress, are not necessarily impermissible exercises of Congress' traditional power to legislate with respect to aliens." *Id.* at 526 (quoting *Reno v. Flores*, 507 U.S. 292, 313 (1993)).

The panel failed to establish a plausible constitutional concern with the government's interpretation of § 1225(b)(2) because (1) an alien has no constitutional right to counsel in immigration proceedings, (2) neither empirical evidence nor the statute itself suggests that a detention pending removal proceedings will be unreasonably prolonged, and in any event our court has addressed

such a possibility through as-applied challenges, and (3) it is constitutional for Congress to require the detention of deportable aliens pending removal proceedings without individualized determinations of dangerousness or risk of flight.

## II

The second basic error of the panel was to exercise habeas jurisdiction over this case. Barbosa da Cunha filed a habeas petition in the district court pursuant to 28 U.S.C. § 2241. *See Barbosa da Cunha v. Freden*, No. 25-CV-6532, 2025 WL 3280575, at *1 (W.D.N.Y. Nov. 25, 2025). But his habeas petition did not challenge the authority of the government to *detain* him. Rather, in his removal proceedings Barbosa da Cunha "requested a bond hearing, which an immigration judge denied based on a determination that he was subject to mandatory detention under Section 1225(b)(2)(A)." *Barbosa da Cunha*, 175 F.4th at 70. He then filed a habeas petition asking a federal court to order the government to reclassify him as subject to discretionary detention under § 1226(a) and accordingly to provide him a bond hearing. The district court ruled that his "application for habeas relief is granted to the extent that the [c]ourt finds he is detained under 8 U.S.C. § 1226(a) and is therefore entitled to a bond hearing under the relevant regulations." *Barbosa da Cunha*, 2025 WL 3280575, at *7 (citation and capitalization omitted). The district court "ordered that [the government] hold a bond hearing for [Barbosa da Cunha] within ten (10) days of the date of this order." *Id.* (capitalization omitted).

The Supreme Court has identified cases in which "the nature of the relief sought by the habeas petitioners suggests that habeas is not appropriate." *Munaf*, 553 U.S. at 693. It has explained that "[h]abeas is at its core a remedy for unlawful executive detention," and "[t]he

typical remedy for such detention is, of course, release." *Id.* In this case, Barbosa da Cunha did not claim he was entitled to release but asked the district court to order the government to reclassify him and to hold a bond hearing.[23] By requesting that the district court order the government to take actions other than release, Barbosa da Cunha was actually seeking relief akin to a mandatory injunction or mandamus. *Cf. Miguel v. McCarl*, 291 U.S. 442, 452 (1934) ("The mandatory injunction here prayed for is in effect equivalent to a writ of mandamus, and governed by like considerations.").

Allowing an alien to bring such a claim in habeas "would require us to broaden the scope of habeas relief beyond recognition." *Wilkinson*, 544 U.S. at 85 (Scalia, J., concurring). And it would contradict the holding of the Supreme Court in *Thuraissigiam.* In that case, the Supreme Court held that the relief an alien "sought in the habeas petition and still seeks—a writ directing [the government] to provide him a new opportunity to apply for asylum—is not a form of relief that was available in habeas at the time of the adoption of the Constitution." *Thuraissigiam*, 591 U.S. at 117 n.13 (internal quotation marks, alteration, and citation omitted). The same reasoning applies here: "[T]he writ has never encompassed [Barbosa da Cunha's] claims." *Id.* at 116 n.12.

**A**

At the founding, the writ of habeas corpus "simply provided a means of contesting the lawfulness of restraint and securing *release*."

[23] His petition asked the district court to "[i]ssue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately, or, in the alternative, provide Petitioner with a bond hearing." App'x 20. The petition thereby recognized that the purported injury he sought to remedy was the denial of a bond hearing rather than the detention itself.

*Id.* at 117 (emphasis added). "Blackstone wrote that habeas was a means to 'remove the injury of unjust and illegal confinement.'" *Id.* (alteration omitted) (quoting 3 William Blackstone, Commentaries *137). "Justice Story described the 'common law' writ the same way," explaining that habeas "is the appropriate remedy to ascertain whether any person is rightfully in confinement or not." *Id*. (alteration omitted) (quoting 3 Commentaries on the Constitution of the United States § 1333, at 206 (1833)). Habeas allowed a detainee to challenge an unlawful confinement and to obtain release.

While the availability of the writ has expanded since the founding,[24] the Supreme Court has emphasized that it remains a mechanism for obtaining release from unlawful custody. *See Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear … from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *see also Munaf*, 553 U.S. at 693.

To understand Barbosa da Cunha as seeking habeas relief "would extend the writ of habeas corpus far beyond its scope 'when the Constitution was drafted and ratified.'" *Thuraissigiam*, 591 U.S. at 107 (quoting *Boumediene*, 553 U.S. at 746). "Indeed, [Barbosa da Cunha's] use of the writ would have been unrecognizable at that time. Habeas has traditionally been a means to secure *release* from unlawful detention, but [he] invokes the writ to achieve an entirely different end." *Id.* Barbosa da Cunha sought to be classified as an alien detained

[24] *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 826-27 (2008) (Scalia, J., dissenting) ("Today, for the first time in our Nation's history, the Court confers a constitutional right to habeas corpus on alien enemies detained abroad by our military forces in the course of an ongoing war.").

under § 1226 rather than § 1225. And if he obtained *that* relief, he could then receive a bond hearing from the executive branch. And following that hearing, the executive branch might or might not release him on bond pending his removal proceedings.

In requesting this relief, Barbosa da Cunha resembles the petitioner in *Thuraissigiam*. In *Thuraissigiam*, the immigration detainee sought relief he labeled "habeas," but the Supreme Court explained that he had invoked the "writ to achieve an entirely different end, namely, to obtain additional administrative review of his asylum claim and ultimately to obtain authorization to stay in this country." *Id.* In his brief, the detainee stated "that 'he requests an entirely ordinary habeas remedy: conditional release pending a lawful adjudication.'" *Id.* at 117 n.13. The Supreme Court first noted that the detainee did not mention release in his petition, but it emphasized that "the critical point is that what he sought in the habeas petition and still seeks—a writ directing the Department to provide him a new opportunity to apply for asylum—is not a form of relief that was available in habeas at the time of the adoption of the Constitution." *Id.* (internal quotation marks, alterations, and citation omitted). The Court concluded that, historically, "the writ has never encompassed respondent's claims." *Id.* at 116 n.12.

The cases that have addressed challenges to conditions of confinement also show that a claim is cognizable in habeas only when the proper remedy is *release*. In those cases, the Supreme Court has indicated that a detained prisoner cannot use habeas to challenge the *conditions* of his confinement as distinct from the *fact* of his confinement. Formally, the Supreme Court has reserved judgment on

the question.[25] But the Court has "repeatedly permitted prisoners to bring § 1983 actions challenging the conditions of their confinement." *Wilkinson*, 544 U.S. at 84 (citing *Cooper v. Pate*, 378 U.S. 546 (1964), and *Wilwording v. Swenson*, 404 U.S. 249, 251 (1971)). So the Court has avoided allowing conditions-of-confinement claims in habeas but has squarely held that such "actions *may* be brought under § 1983." *Id.* at 76 (emphasis added).[26]

Justice Scalia wrote separately in *Wilkinson* to "note that a contrary holding"—allowing claims not seeking release to be brought in habeas—"would require [the Court] to broaden the scope of habeas relief beyond recognition." 544 U.S. at 85 (Scalia, J., concurring). It would conflict with the historical scope of the writ "to say that the habeas statute authorizes federal courts to order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody." *Id.* at 86. "A holding that,"

---

[25] *See Ziglar v. Abbasi*, 582 U.S. 120, 144 (2017) ("[W]e have left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself.").

[26] *See also Nelson v. Campbell*, 541 U.S. 637, 643 (2004) ("[C]onstitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of that core and may be brought pursuant to § 1983 in the first instance."); *Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus and a complaint under … § 1983. Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus; requests for relief turning on circumstances of confinement may be presented in a § 1983 action.") (citations omitted).

for example, "judicial immersion in the administration of discretionary parole lies at the 'core of habeas' would utterly sever the writ from its common-law roots." *Id.*

Our court has suggested an answer to the question that the Supreme Court has reserved. We have held that "*at least* where a petitioner alleges unconstitutional conditions that are irremediable *but for the release* of the petitioner, such conditions of confinement claims are cognizable under habeas." *Diaz v. Kopp*, 146 F.4th 301, 307-08 (2d Cir. 2025) (second emphasis added). That holding confined habeas relief to cases in which release is a *necessary* remedy. In other words, habeas may be used to challenge conditions of confinement if release is the only possible remedy. If the harm may be addressed by a remedy other than release, then habeas is improper. That view prevails in several circuits.[27] And it shows that Barbosa da Cunha was not properly seeking habeas relief in this case.

[27] *See Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 324-25 (3d Cir. 2020) ("We are satisfied that their § 2241 claim seeking only release on the basis that unconstitutional confinement conditions require it is not improper."); *Timms v. Attorney General*, 93 F.4th 187, 191 n.8 (4th Cir. 2024) ("The Supreme Court has not yet decided whether detainees can challenge their confinement conditions via a habeas petition. In several unpublished decisions, we have held that claims challenging conditions of confinement cannot be brought in habeas petitions.") (citations omitted); *Spencer v. Haynes*, 774 F.3d 467, 470 (8th Cir. 2014) ("Spencer's constitutional claim relates to the conditions of his confinement. Consequently, a habeas petition is not the proper claim to remedy his alleged injury.") (citation omitted); *Nettles v. Grounds*, 830 F.3d 922, 930 (9th Cir. 2016) ("We read these statements [from the Supreme Court] as strongly suggesting that habeas is available only for state prisoner claims that lie at the core of habeas (and is the exclusive remedy for such claims), while § 1983 is the exclusive remedy for state prisoner claims that do not lie at the core of habeas.").

**B**

One might compare the relief the district court ordered to a writ of "conditional release" issued to a prisoner who successfully challenged his conviction in habeas. *See Herrera v. Collins*, 506 U.S. 390, 403 (1993) ("The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner."). The panel suggested this comparison. *See Barbosa da Cunha*, 175 F.4th at 70 ("The district court granted the petition and ordered the government to either provide a bond hearing or release Petitioner within ten days."). But that is an improper analogy for two reasons.

First, if conditional release were generally available in habeas, the conditions-of-confinement cases would be wrongly decided. The petitioner would always be able to seek an order that the government must fix the conditions of confinement or allow release. Any claim could be recast as a request for conditional release. But the request for such an order is not *actually* a request for release; it is a request for an injunction directing the government to do something other than release, namely to rectify the conditions of confinement. Barbosa da Cunha made that sort of request here. Even though his request was framed as conditional release, his prayer for relief would be satisfied if he were reclassified and then given a bond hearing. The bond hearing would entitle him only to apply for a release on bond. And even if he obtained release on bond following the hearing, the "Attorney General at any time may revoke" that bond before proceeding to "rearrest the alien under the original warrant, and detain [him]." 8 U.S.C. § 1226(b).

By awarding such relief, a district court is directing *how* the government must *administer* its detention of the petitioner—as it does

when addressing a conditions-of-confinement claim—not deciding *whether* the government has the authority to *detain* him. Because Barbosa da Cunha challenges the manner of administration rather than the authority to detain, the relief that he "seeks—a writ [directing the federal government to reclassify him and give him a bond hearing]—is not a form of relief that was available in habeas at the time of the adoption of the Constitution." *Thuraissigiam*, 591 U.S. at 117 n.13.

Second, a prisoner detained pursuant to an unlawful conviction or sentence does *not* bring a habeas petition seeking a new trial. He seeks *release* from his unlawful confinement. If he prevails, the judgment against him is deemed to be "invalid," and "[c]onditional writs [merely] enable habeas courts to give [the government] time to replace an invalid judgment with a valid one." *Wilkinson*, 544 U.S. at 87 (Scalia, J., concurring). In other words, "the prisoner who shows that his sentencing was unconstitutional is actually entitled to release, because the judgment pursuant to which he is confined has been invalidated; the conditional writ serves only to 'delay the release in order to provide the [government] an opportunity to correct the constitutional violation.'" *Id.* at 86 (alteration omitted) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)).

Barbosa da Cunha occupies a very different position. When he was first detained, he "requested a bond hearing, which an immigration judge denied based on a determination that he was subject to mandatory detention under Section 1225(b)(2)(A), and thus ineligible for bond under Section 1226(a)," and after that denial he "filed a habeas petition." *Barbosa da Cunha*, 175 F.4th at 70. If he had initially received the non-release remedy of a bond hearing, he would have received all the relief to which he claimed to be entitled in his habeas petition. And that relief would not have been based on a

showing that he was "entitled to release." *Wilkinson*, 544 U.S. at 86 (Scalia, J., concurring).

In other words, if Barbosa da Cunha prevailed on the interpretive question in this case—showing that he is not subject to mandatory detention under § 1225(b)(2)—he still "has *not* established a right to release, and so cannot obtain habeas relief—conditional or otherwise." *Id.* at 87. Instead, Barbosa da Cunha would be reclassified as detained under § 1226(a). That reclassification would get him a bond hearing. But even *that* would not entitle him to release. And even if the hearing resulted in his release on bond, the Attorney General could revoke his bond and redetain him, *see* 8 U.S.C. § 1226(b), and there would be no judicial review of the Attorney General's decision, *see id.* § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien *or the revocation or denial of bond or parole*.") (emphasis added); *see also Mahdawi*, 183 F.4th at 124-33 (Menashi, J., concurring) (discussing § 1226(e)).

Barbosa da Cunha does not resemble the prisoner who receives a conditional writ of habeas corpus. If that prisoner prevails and the government takes no further action, he is released from custody because the judgment against him is "invalid." By contrast, if Barbosa da Cunha prevails and the government takes no further action, he is sorted into a different statutory provision that still permits the government to keep him detained. The panel may have characterized the habeas remedy in this case as a conditional writ. But "[c]onditional writs are not an all-purpose weapon with which federal habeas courts can extort from the [government] custodian forms of relief short of release, whether a new parole hearing or a new

mattress in the applicant's cell." *Wilkinson*, 544 U.S. at 87 (Scalia, J., concurring). That is how the district court employed the habeas remedy in this case: as a tool to extort a new hearing from the government even though Barbosa da Cunha did not establish an entitlement to release. Our court erred by allowing the district court to do so.

### C

In this litigation, Barbosa da Cunha has sought to use the writ in the way that the Supreme Court rejected in *Wilkinson*. In that case, two prisoners were "serving lengthy terms in Ohio prisons." *Id.* at 76 (majority opinion). One prisoner, Dotson, "began to serve a life sentence in 1981," and in 2000 a parole officer "determined that he should not receive further consideration for parole for at least five more years." *Id.* But "[i]n reaching this conclusion about Dotson's parole eligibility, the officer used parole guidelines first adopted in 1998, after Dotson began to serve his term." *Id.* at 76-77. Dotson argued "that the retroactive application of these new, harsher guidelines to his preguidelines case violates the Constitution's *Ex Post Facto* and Due Process Clauses." *Id.* at 77. He asked a federal district court to issue a "declaration" and "permanent injunction ordering prison officials to grant him an 'immediate parole hearing in accordance with the statutory laws and administrative rules in place when he committed his crimes.'" *Id.* (alteration omitted). Johnson, the other prisoner in the case, brought similar claims. *See id.*

"Both prisoners brought" their cases under § 1983. *Id.* But the district court "concluded that a § 1983 action does not lie and that the prisoner would have to seek relief through a habeas corpus suit." *Id.* The Supreme Court upheld the reversal of that decision, holding that the claims could proceed under § 1983. *See id.* at 82. The Court

explained that "Dotson and Johnson seek relief that will render invalid the state procedures used to deny parole eligibility (Dotson) and parole suitability (Johnson). Neither respondent seeks an injunction ordering his immediate or speedier release into the community." *Id.* (citation omitted). In particular, "[s]uccess for Dotson does not mean immediate release from confinement or a shorter stay in prison; it means at most new eligibility review, which at most will speed *consideration* of a new parole application." *Id.* Likewise, "[s]uccess for Johnson means at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term." *Id.* "Because neither prisoner's claim would necessarily spell speedier release, neither lies at 'the core of habeas corpus.'" *Id.* (quoting *Preiser*, 411 U.S. at 489).

The Court held that the prisoners' claims were not properly considered habeas claims because the prisoners did not claim an entitlement to release. The prisoners instead sought new hearings under lawful parole standards. As in this case, those new hearings could have increased the *likelihood* of eventual release. But because the requested relief would not "necessarily spell speedier release," the Supreme Court concluded that § 1983 rather than habeas was the proper avenue for seeking it. The same reasoning applies to Barbosa da Cunha. He requested a bond hearing that would increase the possibility of release but not necessarily result in release. He is just like the prisoners in *Wilkinson*.

The panel opinion contradicts *Wilkinson* and subsequent decisions of the Supreme Court. Because the relief Barbosa da Cunha sought "is not a form of relief that was available in habeas at the time of the adoption of the Constitution," the district court lacked habeas jurisdiction and the petition should have been either dismissed or

construed as a request for injunctive relief against the government. *Thuraissigiam*, 591 U.S. at 117 n.13.

**D**

The distinction between habeas relief, on the one hand, and injunctive or mandamus relief, on the other, is not a mere formality.

First, the Suspension Clause restricts the authority of Congress to make traditional habeas remedies unavailable. *See Boumediene*, 553 U.S. at 771 ("If the privilege of habeas corpus is to be denied to the detainees now before us, Congress must act in accordance with the requirements of the Suspension Clause."). For that reason, a court will interpret the jurisdictional bars in the INA differently depending on whether those bars are understood to deny an avenue for relief that was available in habeas when the Constitution was adopted.[28] By contrast, the Suspension Clause does not limit the authority of Congress to withdraw jurisdiction over non-habeas claims such as claims for injunctive relief. As a result, understanding whether the claim of an immigration detainee is properly considered in habeas will affect how much a court will respect the jurisdictional bars in the INA.

Second, if a petitioner prevails on a habeas claim, then he is automatically entitled to relief. "[W]here probable ground is shown that the party is in custody under or by color of authority of the United States, and is imprisoned without just cause, and, therefore, has a right to be delivered, the writ of habeas corpus then becomes a

[28] *See, e.g.*, *Demore*, 538 U.S. at 537 (O'Connor, J., concurring in part and concurring in the judgment) ("Because § 1226(e) plainly deprives courts of federal habeas jurisdiction over claims that mandatory detention under § 1226(c) is unconstitutional, one could conceivably argue that such a repeal violates the Suspension Clause.").

writ of right *which may not be denied*, as it ought to be granted to every man who is unlawfully committed or detained in prison or otherwise restrained of his liberty." *Ex parte Lange*, 85 U.S. 163, 183 (1873) (emphasis added).

When the decision to award relief depends on equitable considerations, however, relief is not automatic.[29] "[I]t is not the province of a court of equity to interfere for the prevention of an act merely because it is illegal." *Ward v. City of Little Rock*, 41 Ark. 526, 531 (1883). The "equity tradition" has "developed a series of doctrines to limit equitable powers—principles about what equity will not do."[30] Among those doctrines is the principle that "[i]t is not within the jurisdiction of a court of equity to interfere with the public duties of the departments of government" because "[i]ts jurisdiction pertains only to questions of the maintenance of civil rights [and] property rights." *Heffran v. Hutchins*, 160 Ill. 550, 554 (1896).[31]

---

[29] While a remedy such as mandamus is legal, the right to such a remedy will "turn on equitable considerations." *United States ex rel. Girard Tr. Co. v. Helvering*, 301 U.S. 540, 543 (1937); *see In re Skinner & Eddy Corp.*, 265 U.S. 86, 96 (1924) ("Although classed as a legal remedy, in issuing it a court must be largely controlled by equitable principles."); *United States ex rel. Arant v. Lane*, 249 U.S. 367, 371 (1919) ("This court has lately said that while mandamus is classed as a legal remedy, it is a remedial process, which is awarded not as a matter of right, but in the exercise of a sound judicial discretion and upon equitable principles."); *Duncan Townsite Co. v. Lane*, 245 U.S. 308, 312 (1917).

[30] Aditya Bamzai & Samuel L. Bray, *Debs and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 709 (2022).

[31] *See* 1 John Norton Pomeroy, A Treatise on Equitable Remedies § 337, at 595 (1905) ("[C]ourts hesitate to interfere with the executive branch of the government in matters affecting the performance of its functions."); *see also Taylor v. Kercheval*, 82 F. 497, 500 (C.C.D. Ind. 1897) ("Injury to property, actual or threatened, is the foundation of chancery jurisdiction. It is not

In this case, even the panel agreed that Barbosa da Cunha was not entitled to release. The question was *which* authority the government should invoke to detain him. By ordering the government to rely on § 1226(a), the panel did not vindicate a "civil right," a private right to a particular statutory classification, or any clear statutory entitlement to a bond hearing.[32] Instead, the panel issued a decision that directs how the government administers the immigration system. Equitable considerations require a court to do more before engaging in "this sort of judicial immersion in the administration" of immigration procedures. *Wilkinson*, 544 U.S. at 86 (Scalia, J., concurring). "An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010). Such "[e]quitable relief is not granted as a matter of course, and a court should be particularly cautious when contemplating relief that implicates public interests." *Id.* (citation omitted).

---

concerned with matters of a political nature.") (quoting *Muhler v. Hedekin*, 20 N.E. 700, 701 (Ind. 1889)); *Sheridan v. Colvin*, 78 Ill. 237, 247 (1875) ("It is elementary law, that the subject matter of the jurisdiction of the court of chancery is civil property. The court is conversant only with questions of property and the maintenance of civil rights. … The court has no jurisdiction in matters merely criminal or merely immoral, which do not affect any right to property. Nor do matters of a political character come within the jurisdiction of the court of chancery.").

[32] *Cf. FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1553 (2026) ("To create a private right, a statute must use rights-creating language aimed at protecting a particular class of persons. Language that focuses on the person regulated rather than the individuals protected does not fit the bill.") (internal quotation marks, alteration, and citations omitted).

It is especially important to consider the equities in this context. The Constitution requires special caution before a court orders injunctive relief against the government with regard to enforcement of the immigration laws. *See Biden*, 597 U.S. at 805-06 (identifying "the context of immigration law, where 'the dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy'") (alteration omitted) (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)). By entertaining a request for injunctive relief against the government as if it were a proper habeas remedy, the panel sidestepped these equitable considerations. I would rehear the case *en banc* to clarify that traditional equitable considerations apply to such a request for relief.

**E**

"[T]he refusal to consider arguments not raised is a sound prudential practice, rather than a statutory or constitutional mandate, and there are times when prudence dictates the contrary." *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring). "While 'courts normally decide only questions presented by the parties,' we are not 'hidebound by the precise arguments of counsel,'" *In re TransCare Corp.*, 81 F.4th 37, 61 (2d Cir. 2023) (Menashi, J., dissenting in part) (citation omitted) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 376, 380 (2020)), and we "have 'discretion to consider arguments waived or forfeited below because our waiver and forfeiture doctrine is entirely prudential,'" *id.* (quoting *United States v. Gomez*, 877 F.3d 76, 95 (2d Cir. 2017)). "[W]e have exercised our discretion to review waived or abandoned arguments 'where the argument presents a question of law and there is no need for additional fact-finding.'" *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 232 n.25 (2d Cir. 2023) (alteration omitted) (quoting

*Sniado v. Bank Aus. AG*, 378 F.3d 210, 213 (2d Cir. 2004)). The habeas argument here presents a question of law and requires no additional fact-finding.

The courts of appeals will rehear a case *en banc* and seek supplemental briefing from the parties to address a question that the panel did not consider.[33] I would have followed that course here.

* * *

Congress "deemed" an "alien present in the United States who has not been admitted" to be an "applicant for admission." 8 U.S.C. § 1225(a)(1). Even though the unadmitted and illegally present alien is not *literally* an applicant for admission, the statute requires the government—and a court—to treat him as one. Unadmitted illegal aliens are "deemed *constructive* applicants for admission by operation of [§ 1225(a)(1)] of the [INA]." *Lemus-Losa*, 25 I. & N. Dec. at 743 n.6. If we follow that statutory directive, this case becomes straightforward. An applicant for admission is seeking admission. So pursuant to § 1225(a)(1), an "alien present in the United States who has not been admitted" is seeking admission. Under § 1225(b)(2)(A), therefore, if such an alien "is not clearly and beyond a doubt entitled

[33] *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 865 (11th Cir. 2022) (noting that the court "asked the parties in our *en banc* briefing notice" to consider "the good-faith exception to the exclusionary rule," which "neither addressed" before the panel); *Alam v. Garland*, 11 F.4th 1133, 1135 (9th Cir. 2021) (noting that "[i]n considering the petition for rehearing en banc, we requested that the parties provide supplemental briefing as to whether there is a conflict between a single factor rule and the REAL ID Act," which the parties had not previously argued); *United States v. White*, 863 F.3d 784, 787 (8th Cir. 2017) (noting that for the *en banc* rehearing, "[t]he parties submitted supplemental briefing" on whether a prior precedent "should remain good law" and if not how a different standard would apply).

to be admitted, the alien shall be detained for a [removal] proceeding."

The panel avoided that straightforward result by artificially limiting the reach of the deeming provision that Congress enacted. According to the panel, an unadmitted illegal alien will be deemed to be an applicant for admission only for purposes of that statutory label but will not be treated as an applicant for admission unless the alien is *literally* applying for admission. Because a *constructive* applicant for admission is not *literally* seeking admission, the panel concluded that a constructive applicant cannot be treated the way an actual applicant would be. Under the panel's interpretation, there is no operative provision of § 1225 that treats an unadmitted illegal alien as an applicant for admission. That is an indefensibly constrained reading of the deeming provision that fails to respect the choice of Congress to treat an alien who has not been admitted *as if* he were applying for admission.

The panel dressed up its atextual interpretation of the INA with the language of textualism and citations to online dictionaries—even though "dictionary definitions" are "largely unhelpful" when "the interpretive question presented here is best answered by reference to the statutory classification that pervades the INA." *Cirrus Rojas*, 183 F.4th at 935 (Sykes, J., dissenting). The panel insisted that its reliance on such extra-statutory sources represented faithful adherence to the statute. It said that "[i]f judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives." *Barbosa da Cunha*, 175 F.4th at 96 (quoting *Bostock*, 590 U.S. at 654-55).

"[B]ut no one should be fooled." *Bostock*, 590 U.S. at 685 (Alito, J., dissenting). The panel's opinion "is like a pirate ship. It sails under a textualist flag, but what it actually represents is a theory of statutory interpretation that Justice Scalia excoriated." *Id.* Justice Scalia decried "the judge-empowering consequences" of an "interpretive rule" that "[w]hen there is 'dissonance' between the statutory definition and the ordinary meaning of the defined word, the latter may prevail." *Bond*, 572 U.S. at 871 (Scalia, J., concurring in the judgment). In his view, "the true rule is entirely clear: 'When a statute includes an explicit definition, we must follow that definition, *even if it varies from that term's ordinary meaning*.'" *Id.* (quoting *Stenberg*, 530 U.S. at 942).

Rather than follow the express directive of Congress to treat an unadmitted illegal alien *as if* he were an applicant for admission, the panel opportunistically replaced the constructive understanding of the statutory terms with its own literal understanding. To do otherwise, it announced, "would send a seismic shock through our immigration detention system and society, straining our already overcrowded detention infrastructure, incarcerating millions, separating families, and disrupting communities." *Barbosa da Cunha*, 175 F.4th at 93. It concluded that Congress cannot achieve such a policy "in such an indirect and ambiguous way." *Id.* But "[i]magine what future courts can do with that judge-empowering principle: Whatever has improbably broad, deeply serious, and apparently unnecessary consequences [must be] *ambiguous*!" *Bond*, 572 U.S. at 870 (Scalia, J., concurring in the judgment). In my view, "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022).

I would rehear this case *en banc* to give effect to the deeming provision throughout the INA. "After all, only the words on the page constitute the law adopted by Congress and approved by the

President." *Bostock*, 590 U.S. at 654. The decision of the panel to replace the deeming provision with its own literalistic definitions effectively amends the statute "outside the legislative process reserved for the people's representatives." *Id.* at 655. And I would rehear the case *en banc* for the additional reason that the panel opinion "broaden[s] the scope of habeas relief beyond recognition" by entertaining a request for injunctive relief against the government as if it were relief traditionally available in habeas. *Wilkinson*, 544 U.S. at 85 (Scalia, J., concurring). Because the court declines to correct these errors, I dissent.